UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FOCUS ENTERPRISES, INC.,    )
                      )
         Plaintiff,    )
                      )
v.                    )   Civil Action No: 06-2068 (GK)
                      )     ORAL ARGUMENT REQUESTED
ZASSI MEDICAL EVOLUTIONS, INC.,)
                      )
         Defendant.    )
                      )
_____)

**DEFENDANT'S MOTION TO DISMISS THE COMPLAINT AND/OR TRANSFER THE ACTION, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT, <u>AND REQUEST FOR ORAL ARGUMENT</u>**

Defendant, Zassi Medical Evolutions, Inc. ("Zassi"), by and through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 12(b)(2) and 28 U.S.C. § 1404, hereby moves the Court to enter an order dismissing the Complaint and/or transferring the action to the Middle District of Florida, Jacksonville Division, and, in support thereof, would show the following:

**PRELIMINARY STATEMENT**

1.    The plaintiff, Focus Enterprises, Inc. ("Focus"), filed a three-count complaint seeking relief for breach of an oral agreement, unjust enrichment, or quantum meruit arising out of the sale of one of Zassi's product lines to one of Zassi's competitors, Hollister, Inc. ("Hollister").  The crux of Focus' claims is that

Zassi orally agreed to pay five percent of the funds raised through the sale of debt or equities, or assets. (Complaint ¶¶ 18-23.)

2. Significantly, Focus' lawsuit is not based on the parties' eight-page written agreement dated August 30, 2005 ("Written Agreement") and drafted by Focus, by which Focus would be compensated for raising investment capital through the sale of debt or equities (not assets) and which contained the standard merger, non-modification, and choice of law (Florida) provisions.

3. Just as significantly, and perhaps understandably, the Complaint is devoid of any allegations which establish personal jurisdiction over Zassi.

4. The following are Zassi's contacts with the District of Columbia (none of which arise out of the alleged oral agreement):

> A. A single telephone call by Zassi's Chief Executive Officer returning a telephone call from Focus' Chief Executive Officer;
>
> B. Communications by e-mail and telephone between Zassi and a research associate purportedly located in the District of Columbia regarding the revision of a previously-existing Confidential Information Memorandum ("CIM") to be prepared pursuant to the Written Agreement;

C.   Seven payments mailed to Focus in the District of Columbia pursuant to the Written Agreement; and

D.   Zassi's Bowel Management System (BMS) products, which were sold to independent distributors in Maryland and then sold by the distributors to hospitals located in the District of Columbia, were used by medical providers in the District of Columbia.

## FACTUAL BACKGROUND

5.   Zassi is a Florida corporation with its principal place of business in Fernandina Beach, Florida (Walker Aff. ¶ 9.)[1] Founded in 1997, Zassi designs, develops, and manufactures state of the art gastrointestinal (GI) waste management systems and medical devices.  (Walker Aff. ¶¶ 8,10.)

6.   Zassi's BMS product, its first product to receive Food and Drug Administration clearance, was commercialized in March 2003.  The BMS device is a catheter system designed to safely and reliably divert, collect, and contain potentially harmful and contaminated GI waste from bedridden and immobilized patients. (Walker Aff. ¶ 11.)

---

[1]The Affidavits of Joseph R. Walker and Peter von Dyck in support of this Motion are attached as Exhibits A and B, respectively.

7.    As a startup and relatively small competitor in the medical device industry, Zassi has relied to some extent upon investment capital to fund its operations and growth. (Walker Aff. ¶ 14.)  In its eight-plus years of existence, Zassi has sought to raise working capital through the sale of debt and/or equities on at least twelve (12) occasions. (Walker Aff. ¶ 16.)  In or about the Spring of 2005, Zassi determined that it would again explore raising capital to fund the development and marketing of its products. (Walker Aff. ¶ 32.)

8.    On August 30, 2005, Zassi entered into a Written Agreement pursuant to which Focus agreed on a non-exclusive basis to use its best efforts to assist in raising capital for investment in Zassi by identifying and locating prospective investor candidates, assisting in pre-qualifying the investor candidates, making introductions of the investor candidates to Zassi, and facilitating meetings between Zassi and the investor candidates. (Walker Aff. ¶ 34; Von Dyck Aff. ¶ 5; see Von Dyck Aff. Ex. A § 1.) In the event Focus was able to raise capital through an investor's purchase of Zassi's equity, Focus would receive a fee "equal to 5% of the total Transaction value of any and all common or preferred equity located on behalf of Client." (Von Dyck Aff. Ex. A § 2(a)(i).)

9.   On July 14, 2006, Zassi and Hollister, a competitor Zassi has known and dealt with for several years, executed a Letter of Intent regarding the purchase and sale of Zassi's BMS product line. (Walker Aff. ¶ 59.)  For example, Zassi and Hollister entered into a Confidentiality/NonDisclosure Agreement as early as 1998 and again in November 2005.  (Walker Aff. ¶¶ 17, 18.)

10.   Even though Focus played no role in locating Hollister or negotiating the transaction, Focus recommended in a letter dated July 20, 2006, that the Written Agreement should be amended to include a fee to Focus when the Hollister transaction closed. (Walker Aff. ¶ 61.)  Recognizing that it cannot recover under the Written Agreement, Focus now attempts to assert that the parties entered into an oral agreement for a commission arising out of the sale of Zassi's assets to Hollister.

**LEGAL BASES**

11.   The Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) because Zassi is not subject to personal jurisdiction in the District of Columbia under the District of Columbia Long Arm Statute, D.C. Code § 13-423, or under the Due Process Clause of the United States Constitution.

12.   Pursuant to 28 U.S.C. § 1404, this Court should exercise its discretion and transfer this action to the United States District Court, Middle District of Florida, Jacksonville Division.

WHEREFORE, Defendant, Zassi Medical Evolutions, Inc., respectfully requests this Court to enter an order dismissing the Complaint and/or transferring the action to the United States District Court, Middle District of Florida, Jacksonville Division.

## REQUEST FOR ORAL ARGUMENT

Pursuant to LCvR 7(f), Plaintiff hereby requests oral argument.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE ZASSI IS NOT SUBJECT TO PERSONAL JURISDICTION IN THE DISTRICT OF COLUMBIA.

To determine whether a non-resident defendant is subject to jurisdiction in the District of Columbia, a court must engage in a two-part inquiry: first, whether the long-arm statute authorizes jurisdiction, and if so, whether the exercise of jurisdiction is constitutionally permissible. Oil, Chemical & Atomic Workers Int'l Union, AFL-CIO v. Pena, 18 F.Supp.2d 6, 16 (D.D.C. 1998) (Kessler, J.) (citing Steinberg v. Int'l Criminal Police Org., 672 F.2d 927, 930 (D.C. Cir. 1981)), aff'd, 214 F.3d 1379 (D.C. Cir. 2000).  The plaintiff bears the initial burden of alleging a factual basis for

the exercise of personal jurisdiction over the defendant.
Cellutech, Inc. v. Centennial Cellular Corp., 871 F.Supp. 46, 48
(D.D.C. 1994). A plaintiff cannot rely on conclusory allegations,
but rather "must allege specific facts on which personal
jurisdiction can be based." Robinson v. Ashcroft, 357 F.Supp.2d
142, 144 (D.D.C. 2004); see also Ulico Cas. Co. v. Fleet Nat'l
Bank, 257 F.Supp.2d 142, 144 (D.D.C. 2003) ("The plaintiff must
allege specific acts connecting the defendant with the forum. Bare
allegations and conclusory statements are insufficient.") (citation
omitted); Cellutech, 871 F.Supp. at 48 ("[P]laintiff must allege
some specific facts evidencing purposeful activity by defendants in
the District of Columbia by which they invoked the benefits and
protections of its laws and specific acts connecting the defendants
with the forum."). Here, Zassi is not subject to jurisdiction
under the District of Columbia's long-arm statute or the Due
Process Clause.

**A.    The District of Columbia Long-Arm Statute**

Before engaging in the jurisdictional analysis under the long-
arm statute, it is important to note that Focus' failure to
specifically allege any contacts by Zassi with the District of
Columbia is, by itself, grounds for dismissal. See Novak-Canzeri
v. Saud, 864 F.Supp. 203, 206 (D.D.C. 1994) ("Plaintiff has failed
to allege contacts by the Defendants with the District of Columbia

with the specificity required, or, indeed, any factual basis
sufficient for the exercise of personal jurisdiction over the
Defendants.") (citation omitted).

This Court, in Lee v. State Compensation Ins. Fund, No. Civ.
A. 05-670 (GK), 2005 WL 1903343 (D.D.C. July 13, 2005) (Kessler,
J.), described the seven jurisdictional grounds under section 13-
423, D.C. Code, as follows: (1) supplying services in the District
of Columbia; (2) owning real property in the District of Columbia;
(3) providing insurance in the District of Columbia; (4) family
matters; (5) transacting business in the District of Columbia; (6)
causing tortious injury in the District of Columbia by an act or
omission in the District of Columbia; and (7) causing tortious
injury in the District of Columbia by an act or omission outside
the District of Columbia if the defendant regularly does or
solicits business, engages in any persistent course of conduct, or
derives substantial revenue from goods used or consumed, or
services rendered, in the District of Columbia. Id. at *3-4. This
section provides specific jurisdiction for those claims arising
from the acts enumerated in the statute. Id. ("Section 13-423
makes clear that, where jurisdiction is predicated solely upon the
long-arm statute, 'only a claim for relief arising from acts
enumerated in this section may be asserted.'").[2]

---

[2]Under certain circumstances not present here, a foreign
corporation may be subject to the general jurisdiction of the Court

The only basis under the long-arm statute that merits discussion is the "transacting business" requirement under section 13-423(a)(1),[3] which provides:

> A District of Columbia court may exercise personal jurisdiction over a person . . . as to a claim for relief arising from the person's transacting any business in the District of Columbia.

---

in the District of Columbia under section 13-334(a):  "While general personal jurisdiction permits a court to hear 'a suit . . . without regard to the underlying claim's relationship to the defendant's activity' in the forum, specific personal jurisdiction allows only those claims 'based on acts of a defendant that touch and concern the forum.'" <u>Brunson v. Kalil & Co.</u>, 404 F.Supp.2d 221, 227 (D.D.C. 2005) (quoting <u>Schwartz v. CDI Japan, Ltd.</u>, 938 F.Supp. 1, 5 (D.D.C. 1986)) (omission in original).  This Court has explained that: "[W]here ... a foreign corporation is authorized to do business in the District and has an address (with a phone listing) at which its agent may be served, the broader 'doing business' statute comes into play." <u>Ross v. Product Dev. Corp.</u>, 736 F.Supp. 285, 290 (D.D.C. 1989).  Here, Zassi is not authorized to do business within the District, it does not maintain an address or phone listing in the District, and does not have a registered agent in the District.  (Walker Aff. ¶¶ 62-44, 66.)  Moreover, Section 13-334 is inapplicable because Zassi was not served within the District of Columbia. <u>Gorman v. Ameritrade Holding Corp.</u>, 293 F.3d 506, 514 (D.C. Cir. 2002) ("Where the basis for obtaining jurisdiction over a foreign corporation is § 13-334(a), . . . a plaintiff who serves the corporation by mail outside the District is 'foreclosed from benefitting from [the statute's] jurisdictional protection.'") (alteration in original).  Here, Zassi was not served process within the District of Columbia.  (Walker Aff. ¶ 67.)

[3]Like the defendant in <u>Lee</u>, Zassi does not contract to supply services in the District of Columbia, does not own real property there, is neither an insurer nor a surety in the District, and this is not a family law matter.  (Walker Aff. ¶¶ 68-69.)

"To establish personal jurisdiction under the 'transacting business' clause of the long-arm statute, [a] plaintiff must prove that (1) the defendant transacted business in the District; (2) the claim arose from the business transacted in the District; and (3) the defendant had minimum contacts with the District such that the Court's exercise of personal jurisdiction would not offend 'traditional notions of fair play and substantial justice.'" Cellutech, 871 F.Supp at 48 (quoting Dooley v. United Technologies Corp., 786 F.Supp. 65, 71 (D.D.C. 1992)); see also Brunson v. Kalil & Co., 404 F.Supp.2d 221, 227 (D.D.C. 2005) (holding that a "plaintiff must prove first, that the defendant transacted business in the District of Columbia; second, that the claim arose from the business transacted in D.C.; and third, that the defendant had minimum contacts with the District of Columbia such that the Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice") (internal quotation marks omitted).  Moreover, a "plaintiff must allege some specific facts evidencing purposeful activity by defendants in the District of Columbia by which they invoked the benefits and protections of its laws and specific acts connecting the defendants with the forum." Cellutech, 871 F.Supp. at 48.  As discussed below, Focus cannot establish any of the factors under the "transacting business" requirement because (1) Zassi did not transact business in the District of Columbia, (2) Focus' claim

10

does not arise from any alleged business transacted by Zassi in the District of Columbia, and (3) Zassi's contacts with the District of Columbia do not satisfy the minimum contact and fairness requirements of the Due Process Clause.

**1.    Zassi does not transact business within the District of Columbia.**

There are no allegations in the Complaint that Zassi transacts business within the District of Columbia.  Nor could there be. (<u>See</u> Walker Aff. ¶¶ 68-71.)[4]  The <u>only</u> allegation in the Complaint relating to Zassi's contacts with the District of Columbia is that "[o]n or about September 27, 2006, ZME telephoned Focus at its offices in the District of Columbia and stated that ZME would not pay the Focus Success Fee and ZME would not pay any part of the Focus Success Fee." (Complaint ¶ 40.)  While overseas in Europe in 2006, Zassi's CEO Peter von Dyck received a voice-mail message from Doug E. Rodgers, Focus' CEO.  (Von Dyck Aff. ¶ 6.)  Mr. von Dyck was merely returning Mr. Rodgers' telephone call.  (Von Dyck Aff.

_____

[4]Zassi's BMS products were used by hospitals located within the District.  However, Zassi did not directly sell any of its products to any person within the District, but, rather, sold its products to third-party distributors located in Maryland.  (Walker Aff. ¶ 70.)  Even if this were deemed to be "transacting business" within the District, none of Focus' claims arise from the sale, use, or distribution of the BMS products within the District.  As more fully discussed below, under <u>Brunson</u>, "[b]ased on the fact that Plaintiff's claim did not arise from business transacted in the District of Columbia, this Court cannot have specific personal jurisdiction over [Zassi], pursuant to" section 13-423.  404 F.Supp.2d at 229.

¶ 9.)  This single returned telephone call certainly cannot constitute "transacting business" under the long-arm statute.  See Brunson, 404 F.Supp.2d at 233 ("[T]he phone calls and mailings [defendant] made into the District do not constitute transacting business under the statute."); see also United States v. Ferrara, 54 F.3d 825, 831 (D.C.Cir. 1995) ("It is clear that this single, responsive mailing cannot constitute the 'meaningful' contact or 'substantial connection' between the defendant and the forum state that is required for jurisdiction.") (citations omitted); Cellutech, 871 F.Supp. at 50 (holding that: "The non-resident defendants' long-distance contract negotiations with a non-resident plaintiff's attorney who happened to have offices in the District . . . [is] not [a] significant contact[] to have caused defendants reasonably to anticipate being haled into court here.").

Finally, the allegations of Focus' own contacts with the District of Columbia, (Complaint ¶¶ 5-15, 22, 26, 28), cannot create personal jurisdiction over Zassi.  It is well settled that the actions of another party or third person cannot operate to subject a defendant to jurisdiction in a foreign forum.  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-78 (1985) ("[A] defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person.") (internal quotation marks omitted) (citations omitted); see also Brunson, 404

12

F.Supp.2d at 234 ("[T]he defendant's <u>own action</u> must be such as to put it on notice of the possibility of defending itself in the forum state.") (quoting <u>COMSAT Corp. v. Finshipyards S.A.M.</u>, 900 F.Supp. 515, 520-21 (D.D.C. 1995)).    Accordingly, Focus' allegations of its own conduct within the District of Columbia are inapposite.

**2.    Assuming <u>arguendo</u> that Zassi transacted business within the District of Columbia, this action does not arise from that activity.**

"In order for this Court to have personal jurisdiction over [a non-resident defendant under section 13-423], the actions giving rise to the claim must have occurred in the District." <u>Brunson</u>, 404 F.Supp.2d at 228; <u>see also</u> <u>Meyer v. Fed. Bureau of Prisons</u>, 940 F.Supp. 9, 12 (D.D.C. 1996).    Section 13-423(a) provides that a "court may exercise personal jurisdiction . . . <u>as to a claim for relief arising from</u> [seven specific acts]."    (Emphasis added). Subsection (b) is even more clear, providing that when jurisdiction "is based solely upon this section, only a claim for relief <u>arising from acts enumerated in this section may be asserted against him</u>." (Emphasis added).    <u>See also</u> <u>Gowens v. Dyncorp</u>, 132 F.Supp.2d 38, 42 (D.D.C. 2001) (dismissing plaintiff's complaint because the claims did not have a "significant connection" to defendant's activities within the District); <u>Novak-Canzeri</u>, 864 F.Supp. at 206 ("Plaintiff does not connect the conduct alleged to be the basis

13

for her breach of contract claim with the claim of jurisdictional nexus with the District of Columbia, as required by D.C. Code § 13-423(b).").

Zassi's contacts with the forum, i.e., Mr. von Dyck's telephone call regarding the Written Agreement, checks mailed to Focus for amounts due under the Written Agreement, e-mails and telephone calls with a low-level Focus research associate purportedly located in the District of Columbia regarding the preparation of the CIM pursuant to the Written Agreement, and the sale of its products in the District by independent distributors, are not related to Focus' claims based on an alleged oral agreement. For instance, Focus' claims do not arise out of Zassi's single telephone call into the District of Columbia. See Meyer 940 F.Supp. at 12 (holding that "the plaintiff must show that the claim that is the subject matter of the complaint arose out of the defendant's transacting such business in the District of Columbia"). Instead, that telephone call was in response to Focus' claim that it was entitled to the "Focus Success Fee" under the parties' Written Agreement, not the alleged oral agreement. (See Von Dyck Aff. ¶ 7.) In fact, this telephone call occurred after the alleged acts giving rise to Focus' claims. (See Von Dyck Aff. ¶ 6.)

14

Similarly, Focus' claims do not arise from Zassi mailing seven $5,000 payments to Focus in the District of Columbia pursuant to the Written Agreement. When Zassi received the invoice for each of those payments, Zassi processed the invoice and mailed the check pursuant to the instructions contained on the invoice. (Walker Aff. ¶¶ 74, 75.)[5] Again, however, Focus' claims asserted in the Complaint do not "arise from" these payments. Lee, 2005 WL 1903343, at *3 (holding under section 13-423(a)(1) that "the fact that [defendant] mails a check to Plaintiff on a regular basis does not constitute sufficient minimum contacts to support this Court's exercise of personal jurisdiction").

Moreover, Focus' claims do not arise from Zassi's communications via e-mail and telephone with a research associate purportedly located in the District of Columbia regarding the revisions of the CIM. In order to facilitate the solicitation of Investors[6] under the Written Agreement, Zassi sent a previously-existing CIM to William Inman. (Walker Aff. ¶ 40.) Messrs. Shea and Inman then directed Zassi to Jeff Anderson, a research

---

[5]To demonstrate that no real consideration was given to the payment of the Focus invoices, Zassi actually paid Focus seven $5,000.00 payments although the Written Agreement only required six payments. (Walker Aff. ¶ 75.) To date, Focus has not offered to return the overpayment.

[6]A description of the difference between "Investors" (those who purchase debt or equity of other companies) and "Strategics" (those who purchase assets) is set forth in Mr. Walker's Affidavit in paragraph 15.

associate for Focus, who helped revise the previously-existing CIM. (Walker Aff. ¶ 41.)  Mr. Anderson's location within the District of Columbia (if, in fact, he was located in the District)[7] was completely fortuitous.  Importantly, Mr. Anderson himself traveled to Florida for the kick-off, or orientation session, for the CIM. (Walker Aff. ¶ 46.)  Nobody on behalf of Zassi traveled to the District of Columbia to work on the CIM or for any other purpose relating to any matter at issue in this action.  (Von Dyck ¶ 11; Walker Aff. ¶ 72.)

Any argument that the use of Zassi's BMS products within the District of Columbia constitutes "transacting business" under the long-arm statute should be rejected.  Focus' claims do not arise from the sale or use of Zassi's products within the District of Columbia.  Moreover, Zassi did not purposefully direct its products into the District.  Instead, Zassi's products arrived in the District through third-party distributors.  (Walker Aff. ¶ 70.)  As this Court ruled in <u>Formica v. Cascade Candle Co.</u>, 125 F.Supp.2d 552 (D.D.C. 2001), "even if defendant put its [products] into a national stream of commerce with the knowledge that they would reach the District, it is well-settled that 'a defendant's

---

[7]Mr. Anderson may not even be located within the District of Columbia, as the area code for his contact telephone number is 703, which is in Arlington, Virginia, and Zassi was told by the person who answered the telephone at Focus that Mr. Anderson does not usually work out of Focus' office within the District of Columbia. (Walter Aff. ¶¶ 42, 44; <u>see</u> Von Dyck Aff. ¶ 11.)

awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.'" Id. at 555 (quoting Asahi Metal Indus. Co. v. Superior Ct. of Cal., 480 U.S. 102, 112 (1987)); see also Color Systems, Inc. v. Meteor Photo Reprographic Systems, Inc., Civ. A. No. 86-2516-OG, 1988 WL 13187, at *2 (D.D.C. Feb. 11, 1988) ("[R]equiring something more than mere awareness on the part of defendants that their products would enter the forum State.").

The decision in Brunson is instructive.  In that case, the plaintiff was a Maryland resident and sole shareholder of a New York corporation that operated a television station in Burlington, New York, and maintained its studios in Philadelphia.  404 F. Supp.2d at 223.  The owner brought a declaratory judgment action in the District of Columbia seeking a declaration as to whether she or her company owed the defendant any funds under an exclusive brokerage agreement regarding the sale of the station.  Id.  The defendant moved to dismiss for lack of personal jurisdiction.

After setting forth the basic analysis under the "transacting business" clause of the long-arm statute, the Court observed that the plaintiff traveled to Philadelphia to solicit the brokerage agreement; the brokerage agreement was formed in Philadelphia where plaintiff signed it on behalf of her corporation; and neither party

17

alleged that any of the solicitation, negotiation, or formation of the brokerage agreement occurred in the District. Id. at 228. The Court held that the claim did not arise from business transacted in the District, and rejected plaintiff's argument that the defendant's correspondence with the station's lawyer in the District and contacts with another communications corporation within the District qualified as "transacting business" within the District. Id. at 228-29. The Court explained that the broker was "seeking its commission based on the Brokerage Agreement and the actions it performed under the Brokerage Agreement that it argues brought about the sale of the Station, not based on the communications with [the lawyer] subsequent to the closing." Id. at 229 (citation omitted).

Similarly, here, as in Brunson, Focus traveled to Florida to solicit the Written Agreement, the Written Agreement was executed in Florida, and there is no allegation that any of the solicitation, negotiation, or formation of the Written Agreement occurred in the District of Columbia. Moreover, there are no allegations that the alleged oral agreement was reached within the District and, in fact, Zassi never communicated in person with Focus in the District. (Walker Aff. ¶ 72; see Von Dyck Aff. ¶¶ 11-12.) Accordingly, as none of Focus' claims arise from Zassi transacting business within the District of Columbia, it fails to satisfy the second prong of the analysis.

18

### 3. Zassi is not subject to jurisdiction under the Due Process Clause.

The final prong of a court's analysis is whether exercising jurisdiction over the non-resident defendant will comport with the Due Process Clause of the United States Constitution. Brunson, 404 F.Supp.2d at 236.

> "The constitutional touchstone of the due process determination is 'whether the defendant purposefully established minimum contacts in the forum state.'" The due process analysis consists of three parts: the defendant must (1) "purposefully avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," and (2) "reasonably anticipate being haled into court" in the forum state; finally (3) the "suit [cannot] offend traditional notions of fair play and substantial justice." In addition, [4] the minimum contacts must come about by **an action of the defendant purposefully directly toward the forum state**.

Brunson, 404 F.Supp.2d at 237 (citations omitted) (third alteration added).

### a. Zassi does not have minimum contacts with the District of Columbia to support jurisdiction.

"A defendant has minimum contacts with a jurisdiction when it has 'purposefully directed [its] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." United States v. Philip Morris, Inc., 116 F.Supp.2d 116, 129 (D.D.C. 2000) (Kessler, J.)

19

(quoting <u>Burger King</u>, 471 U.S. at 472-73) (alteration in original). A plaintiff must demonstrate that the defendant "deliberately has engaged in significant activities within a State, or has created 'continuing obligations' between [itself] and residents of the forum." <u>Burger King</u>, 471 U.S. at 475-76 (citation omitted). "Without such minimum contacts, intentionally established, due process is violated when a defendant is required to respond to process in a foreign state." <u>Baltierra v. W. Va. Bd. of Med.</u>, 253 F.Supp.2d 9, 13 (D.D.C. 2003).

Here, there are no allegations in the Complaint that Zassi directed any activities at residents of the District of Columbia. The injuries that are alleged arise out of activities and decisions that occurred in Florida, and, to a lesser extent, Georgia. The negotiations between Focus and Zassi were conducted in Florida, and the Written Agreement was executed in Florida. Since Zassi did not travel to the District to meet with Focus (<u>see</u> Walker Aff. ¶ 72; Von Dyck Aff. ¶ 11), the alleged oral agreement could <u>not</u> have been reached in the District. The assets that Zassi eventually sold to Hollister were located within Florida. All Zassi shareholder meetings, including the meeting referenced in the Complaint (¶ 23), were held in Fernandina Beach, Florida. (Walker Aff. ¶ 47.)

George Shea and William Inman, the only two Focus agents with whom Zassi had substantive dealings, show Florida addresses as

their contact information on Focus' own website.  (Walker Aff. ¶¶ 27, 30.)  In fact, Mr. Inman has been a Florida resident for several years.  (<u>See</u> Walker Aff. ¶ 22.)  The negotiations which led to the execution of the Written Agreement were initially between Zassi and Mr. Inman in Florida.  (Walker Aff. ¶ 33.)  Mr. Inman has had significant prior dealings with Zassi, all of which were negotiated and consummated in Florida.  (Walker Aff. ¶¶ 23, 26.)

During Zassi's relationship with Focus, Mr. Inman, and Mr. Shea, Zassi never traveled to the District of Columbia, and never contemplated traveling there or settling disputes there.  (Walker Aff. ¶ 72; Von Dyck Aff. ¶ 12.)  The Written Agreement drafted by Focus provided that it was governed by Florida law.  (Walker Aff. ¶ 37; Von Dyck Aff. Ex. A § 6(f).)

After Zassi informed Messrs. Inman and Shea that it had entered into a Letter of Intent with Hollister for the sale of its BMS product line, Mr. Inman wrote a five-page letter containing some twenty talking points and three recommendations, including the recommendation that the Written Agreement "should be amended to provide for a fixed fee at the closing of the transaction." (Walker Aff. ¶ 60; Walker Aff. Ex. D at ¶ 5.)  This letter was written on Focus' Atlanta, Georgia letterhead, with an Atlanta address, an Atlanta telephone number, an Atlanta facsimile number, and a Florida cellular telephone number, and was sent to Zassi in

Florida.   (See Walker Aff. Ex. D.)   In short, all of the substantive negotiations, discussions, and dealings between the parties occurred within or between Florida and Georgia, with the overwhelming majority occurring within Florida.

Based on the foregoing, Zassi does not have sufficient "minimum contacts" with the District of Columbia because it has not purposefully directed its activities at residents of the forum, and this litigation does not result from alleged injuries that arise out of or related to such activities.   Focus cannot demonstrate, and has not even alleged, that Zassi "deliberately has engaged in significant activities within [the District], or has created 'continuing obligations' between [itself] and the residents of [the District]."   Burger King, 471 U.S. at 475-76.

In Gowens, this Court refused to exercise personal jurisdiction over the defendant because of due process concerns that "none of the events giving rise to plaintiff's claims occurred in the District of Columbia, the contract between [the defendant corporation] and the federal government was executed in Texas, and the division of [the defendant corporation] which is responsible for plaintiff's employment has its corporate offices in Texas." 132 F.Supp.2d at 42.   Similarly, here, none of the events giving rise to Focus' claim occurred in the District, the alleged oral agreement could not have been reached in the District, and the

division of Focus which was responsible for the contract had its
offices in Georgia.

> **b.    Zassi does not purposefully avail itself
> of the privilege of conducting activities
> within the District of Columbia.**

A plaintiff must show that the defendant "purposefully
avail[ed] itself of the privilege of conducting activities within
the forum State, thus invoking the benefits and protections of its
laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).  There are no
allegations in the Complaint that Zassi purposefully availed itself
of the privilege of conducting activities within the District of
Columbia.  Moreover, even if Zassi had placed its BMS products into
a national stream of commerce with the knowledge that they would
reach the District, as in Asahi Metal Industry Co. v. Super. Ct. of
Cal., 480 U.S. 102, 112 (1987), "a defendant's awareness that the
stream of commerce may or will sweep the product into the forum
State does not convert the mere act of placing the product into the
stream into an act purposefully directed toward the forum State."
See also Formica, 125 F.Supp.2d at 555 (citing Asahi Metal and
dismissing tort action against a candle manufacturer whose candles
were distributed within the District and one that was purchased
within the District allegedly exploded and injured plaintiff).  The
Formica court explained that "[b]ecause defendant has not engaged
in any additional conduct [other than placing the candles in the

stream of commerce] to indicate an intent or purpose to serve the market in the foreign State, defendant lacks the substantial connection . . . necessary for a finding of minimum contacts." <u>Id.</u> (internal quotation marks omitted) (omission in original). Here, as in <u>Asahi Metal</u> and <u>Formica</u>, Zassi has not purposefully availed itself of the privilege of conducting activities within the District of Columbia and thus has not invoked the benefits and protections of its laws. (<u>See</u> Walker Aff. ¶¶ 62-29, 71, 72.)

### c. **Zassi cannot reasonably anticipate being haled into court in the District of Columbia.**

The analysis in <u>Cellutech</u> is particularly applicable to the instant case. In <u>Cellutech</u>, the plaintiff brought a breach of contract action for the sale of a cellular radio system in Michigan, which contract was governed by Michigan law. 871 F.Supp. at 48. Similarly, the action here arises out of an alleged breach of contract relating to Focus raising money for Zassi in Florida, and the Written Agreement between the parties, which was drafted by Focus, provided that it was to be governed by Florida law. (Von Dyck Aff. Ex. A § 6(f).

Judge Friedman explained:

> While the negotiations took place in part by mail and wire into the District of Columbia, none of the principals were involved in negotiations here or were present in the District at any time. It is a mere fortuity, over which defendants had no control and from

> which defendants could derive no expectation
> of consequences, that plaintiff chose
> Washington counsel to conduct these
> negotiations. Defendants' minimal contacts
> with the forum do not manifest a deliberate
> and voluntary association with the District of
> Columbia and simply do not rise to the level
> of transacting business within the District
> that is necessary to invoke the jurisdiction
> of our courts. The non-resident defendants'
> long-distance contract negotiations with a
> non-resident plaintiff's attorney who happened
> to have offices in the District and the wiring
> of money to that attorney's District of
> Columbia bank account are not significant
> enough contacts to have caused defendants
> reasonably to anticipate being haled into
> court here.

Id. at 49-50  (citation omitted).

Here, again, Zassi's long-distance communications with Focus' research associate (who may or may not have been located in the District) about the contents of the solicitation memorandum within the District were merely fortuitous and over which Zassi had no control and from which Zassi could derive no expectation of consequences. Moreover, Zassi's limited contacts with the District of Columbia (mailing seven checks and sporadic communications) do not manifest a deliberate and voluntary association with the District and are not significant enough contacts to have caused Zassi reasonably to anticipate being haled into Court in the District. Accordingly, this prong of the due process analysis cannot be satisfied.

> **d.    Traditional notions of fair play and**
> **substantial justice support dismissal.**

Finally, this Court must determine whether subjecting Zassi to jurisdiction in the District of Columbia would be fair and reasonable so as not to offend traditional notions of fair play and substantial justice.  <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945).  In making this determination, the court considers

(1)  the burden on the defendant in defending the lawsuit;

(2)  the forum's state interest in adjudicating the dispute;

(3)  the plaintiff's interest in obtaining convenient and effective relief;

(4)  the interstate judicial system's interest in obtaining the efficient resolution of the matter; and

(5)  the shared interest of the several states in furthering fundamental social policies.

<u>Burger King</u>, 471 U.S. at 476-77.

Application of these factors demonstrates that it would not be fair to subject Zassi to jurisdiction in the District of Columbia. First, while modern technology and communication has certainly decreased the burdens associated with defending a suit in a foreign forum, it has not eliminated that burden.  Zassi is a relatively small Florida corporation who has been sued by Focus, a Virginia corporation, for breach of an alleged oral agreement.  During

26

Zassi's entire relationship with Focus, it never traveled to the District of Columbia and only once met with Focus agents outside of Florida. (Walker Aff. ¶ 72.) Now, Zassi is potentially burdened with having its executive officers with the most knowledge of the facts of this case travel to the District to defend this matter and remain unavailable during trial to address Zassi's complex business issues. This will certainly increase the cost of defense to Zassi in terms of travel and accommodation expenses for Zassi executives, as well as non-party shareholders.

Second, the District has virtually no interest in adjudicating this dispute, aside from the fortuitous fact that Focus happens to have its corporate headquarters in the District of Columbia. For purposes of this dispute, however, the location of Focus' headquarters is irrelevant. Zassi dealt with Messrs. Inman and Shea, both of whom have local ties to Northeast Florida: Mr. Inman had long been a resident of the Jacksonville area and Mr. Shea also has a residence in Florida. (Walker Aff. ¶¶ 22, 29.)

Third, Focus' interest in obtaining convenient and effective relief militates in favor of this matter being decided in Florida. Focus' two primary witnesses, Messrs. Inman and Shea, live or maintain residences in the Jacksonville, Florida area. Again, there are no factual connections to the District of Columbia and

there can be no argument that Focus would in any way not receive a
fair trial in Florida.

Finally, the interstate judicial system's interests will best
be served if this matter is litigated in Florida, where the dispute
arose and where the underlying facts occurred.  One of the major
thrusts of Focus' Complaint is the February 7, 2006 shareholder
meeting which took place in Florida and was attended by five (5)
Florida residents, all of whom may be witnesses, but none of whom
could be compelled to testify in person in the District of
Columbia.  (See Walker Aff. ¶ 49.)  By contrast, these potential
witnesses are within the subpoena power of a Florida court.
Moreover, while a complete conflicts of laws analysis is beyond the
scope of this argument, there is a strong argument that Florida law
will govern this dispute: the Written Agreement between the parties
provided that Florida law would apply, all of the negotiations and
discussions occurred within the state of Florida, both parties
executed the Written Agreement in Florida, the shareholder meeting
(where the alleged oral agreement purportedly was confirmed)
occurred in Florida, Messrs. Inman and Shea live in or maintain
residences in Florida, Focus' website provides Florida addresses
for Messrs. Inman and Shea, and virtually all of the witnesses are
located in Florida.

II.  **THIS COURT SHOULD TRANSFER THIS ACTION TO THE MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION, BECAUSE THE CONVENIENCE OF THE PARTIES AND WITNESSES AND THE INTERESTS OF JUSTICE WOULD BE SERVED BY SUCH A TRANSFER.**

This Court has discretion pursuant to 28 U.S.C. § 1404, to transfer venue of this lawsuit to the Middle District of Florida. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The decision of whether to transfer is left to the broad discretion of the district court. See, e.g., Lentz v. Eli Lilly & Co., No. 06-1374 (ESH), 2006 WL 3704717, at *1 (D.D.C. Dec. 18, 2006); Jackson v. Fed. Bureau of Prisons, No. 06-592 (GK), 2006 WL 2434938, at *4 (D.D.C. Aug. 22, 2006) (Kessler, J.).[8] Section 1404 grants the district court discretion to "adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness." Reiffin v. Microsoft Corp., 104 F.Supp.2d 48, 50 (D.D.C. 2000) (quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)). The purpose of a transfer is to "prevent the waste 'of time, energy, and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" Amazon.com v. Cendant Corp., 404 F.Supp.2d 1256, 1259 (W.D. Wash 2005) (quoting Van Dusen v.

---

[8]"The Court may transfer an action even though it lacks personal jurisdiction . . ." Id.

Barrack, 376 U.S. 612, 616 (1964)).  "In passing § 1404(a),
Congress 'intended to permit courts to grant transfers upon a
lesser showing of inconvenience' than was needed for dismissal
under the doctrine of forum non conveniens."  Amazon.com, 404
F.Supp.2d at 1259.

Transfer of venue is appropriate where (1) the action
originally could have been brought in the transferee forum, and
(2) the convenience of the parties, the convenience of the
witnesses, and the interests of justice will be served by the
transfer.  28 U.S.C. § 1404(a); Lentz, 2006 WL 3704717, at *1.

**A.    This Action Originally Could Have Been Brought in the
        Middle District of Florida.**

The threshold question in a Section 1404 transfer analysis is
whether the case could have been brought in the desired district of
transfer.  Lentz, 2006 WL 3704717, at *1.  This action clearly
could have been brought in the Middle District of Florida.  The
Middle District of Florida has venue over this action pursuant to
28 U.S.C. § 1391 because venue is proper in a diversity action in
any district where a defendant resides if all defendants reside in
the same state.  In this case, the defendant is a Florida
corporation with its principal place of business in Fernandina
Beach, Florida.  In addition, the Middle District of Florida has
subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C.

§ 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

**B.    This Court Should Transfer this Action to the Middle District of Florida Because the Convenience of the Parties and Witnesses and the Interests of Justice Would Be Served by Such a Transfer.**

Once the Court has determined that the case could have been brought in the transferee forum, the Court must decide whether the balance of convenience of the parties and witnesses and the interests of justice favor transferring the case. <u>Lentz</u>, 2006 WL 3704717, at *1; <u>Schmidt v. Am. Inst. of Physics</u>, 322 F.Supp.2d 28, 33 (D.D.C. 2004).

In determining whether to transfer a case, the Court should consider a number of private and public interest factors.  The private interest factors include: (1) plaintiff's privilege of choosing the forum, (2) defendant's preferred forum, (3) location where the claim arose, (4) convenience of the parties, (5) convenience of the witnesses, and (6) ease of access to sources of proof.  The public interest considerations include: (1) the transferee's familiarity with the governing law, (2) the relative congestion of the courts of the transferor and potential transferee, and (3) the local interest in deciding local controversies at home. <u>Lentz</u>, 2006 WL 3704717, at *2.  Zassi will consider these factors under the express statutory requirements of

31

convenience of parties, convenience of witnesses, and the interests of justice since the nine (9) factors listed above should not be applied mechanically.  See Amazon.com, 404 F.Supp.2d at 1259.

### 1.  Convenience of the Parties

The convenience of the parties weighs heavily in favor of transfer.  Although the plaintiff's choice of forum is entitled to some deference and is one of the factors to be considered by the Court, it is not controlling.  "This deference is mitigated, however, where the plaintiff's choice of forum has 'no meaningful ties to the controversy and no particular interest in the parties or subject matter." Schmidt, 322 F.Supp.2d at 33.  Indeed, "the defendant['s] burden in a motion to transfer decreases when the plaintiffs' choice of forum has no meaningful nexus to the controversy and the parties."  Lentz, 2006 WL 3704717, at *3 (alteration in original) (quoting Greater Yellowstone Coal. v. Bosworth, 180 F.Supp.2d 124, 128 (D.D.C. 2001)).

At its heart, Focus' action is for breach of an alleged oral agreement and, as discussed above in the jurisdiction section, the material events constituting the factual predicate for the claims occurred in Florida.  In addition, the fact that Focus maintains its headquarters in the District of Columbia is not particularly significant in this transfer analysis.  See Schmidt, 322 F.Supp.2d at 34; Fenwick v. Nat'l R.R. Passenger Corp., No. 91-2617, 1991 WL

257978 (D.D.C. Nov. 210, 1991). Moreover, the plaintiff holds
itself out as providing national and international services through
managing partners heading up several regions, including George Shea
for the Southeastern Region. (Walker Aff. ¶ 30.) Messrs. Shea and
Inman, the two Focus partners directly responsible for handling the
Zassi account, reside in Florida. Focus' research associate, Mr.
Anderson, traveled to Florida to finalize the form of the CIM.
(Walker Aff. ¶ 46.) Thus, Focus would not be severely
inconvenienced by a transfer to the Middle District of Florida.

Zassi, on the other hand, would be manifestly inconvenienced
if this case were to proceed in the District of Columbia. Zassi is
a Florida corporation with its principal place of business in
Florida. Zassi does not conduct business in the District of
Columbia and has no offices there. In addition, requiring Zassi to
send numerous employees to the District for what may be a lengthy
trial could substantially interfere with Zassi's business. Zassi's
managers need to be present in Florida to handle its complex
business concerns. Thermal Technologies, Inc. v. Dade Service
Corp., 282 F.Supp.2d 1373, 1376-77 (S.D. Fla. 2003) (where the
defendant's business was located in the transferee forum, all
documents in the defendant's possession relating to the lawsuit
were in the transferee forum, and the defendant's president, vice
president, and office manager would be required to be absent from

work to attend the trial, convenience of the parties weighed in favor of transfer).

> ### 2. Convenience of and Access to Witnesses and Other Sources of Proof

The convenience of the witnesses and access to witnesses and other sources of proof in this case also strongly favor transfer. Convenience of the witnesses is "a primary, if not the most important, factor in passing on a motion to transfer under § 1404(a)." McEvily v. Sunbeam-Oster Co., 878 F.Supp. 337, 344-45 (D.R.I. 1994). "When considering the convenience to witnesses, 'the convenience of non-party witnesses is the more important factor.'" Amazon.com, 404 F.Supp.2d at 1260 (quoting Saleh v. Titan Corp., 361 F.Supp.2d 1152, 1160 (S.D. Cal. 2005)). The ability of the Court to compel the presence of witnesses and the costs of obtaining the presence of witnesses are related factors that the Court should consider. New England Mach., Inc. v. Conagra Pet Products Co., 827 F.Supp. 732, 734 (M.D. Fla. 1993). Courts routinely transfer actions from the plaintiff's chosen forum when the majority of the witnesses reside in the transferee state. See Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 655 (11th Cir. 1993).

In this case, plaintiff's claims arise from an oral agreement reached in Florida and which was allegedly confirmed during a

shareholder meeting in Florida.  An overwhelming majority of the potential witnesses live and work in Florida.  (See Walker Aff. ¶¶ 9, 22, 27, 29, 30, 49, 76.)  Witnesses who have or may have knowledge relevant to the claims and defenses at issue in this case include Zassi's current and former directors, officers, employees, and shareholders and Focus' two partners responsible for the account, both of whom reside in Florida.  Finally, the vast majority of the non-party witnesses (e.g., Zassi's shareholders) are not subject to the subpoena power of this Court for purposes of trial.  See Fed.R.Civ.P. 45(b)(2) (subpoena may be served only within 100 miles of the place of the deposition, hearing, trial, production, or inspection).

Another important factor in the transfer analysis is access to sources of proof and the location of relevant documents.  As with the witnesses, where the majority of the documents and other evidence related to the issues raised by the lawsuit are located in the transferee forum, courts regularly hold that the transfer of the action to the forum is appropriate.  See Lentz, 2006 WL 3704717, at *2.  Substantially all of the documents relevant to the claims and defenses at issue in this case are located in Zassi's headquarters in Florida (Walker Aff. ¶ 77), or the files maintained electronically or otherwise by Mr. Inman in Florida.

Thus, because the overwhelming majority of documents and witnesses relevant to this dispute are located in Florida, the convenience of the witnesses and considerations of access to sources of proof weigh strongly in favor of transfer.

### 3.    Interests of Justice

"In considering the interests of justice, the Court weighs such factors as 'insuring speedy trials, trying related litigation together, and having a judge who is familiar with the applicable law try the case.'" Amazon.com, 404 F.Supp. 2d at 1261. Overall, these factors favor transfer to the Middle District of Florida.

First, recent statistics from the Administrative Office of the United States Courts show the Middle District of Florida has a lower per-judge civil case load than the District of Columbia and civil cases proceed to trial in approximately one-half the amount of time in the Middle District of Florida (19.2 months) than in the District of Columbia (37 months). See U.S. District Court Judicial Caseload Profiles - Middle District of Florida and District of Columbia, available at http://www.uscourts.gov/cgi-bin/cmsd2006.pl. "The real issue is not whether a dismissal will reduce a court's congestion but whether a trial may be speedier in another court because of its less crowded docket." Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1337 (9th Cir. 1984). In this case, the

statistics with respect to the median time to trial show that the speedier trial will be offered in the Middle District of Florida.

Second, where the substantive law of a particular state will be applied to the plaintiff's claims, the interests of justice favor transferring the action to a court sitting in that state. Lentz, 2006 WL 3704717, at *2; Kafack v. Primerica Life Ins. Co., 934 F.Supp. 3, 8 (D.D.C. 1996) ("The interests of justice are best served by having a case decided by the federal court in the state whose laws govern the interests at stake."). As discussed above at page 28, there is a strong argument that Florida law will be applied to the plaintiff's claims. Moreover, considering that the Written Agreement drafted by Focus provides that Florida law governs, any suggestion that Florida law does not govern the claim for breach of an alleged oral agreement would be, at best, disingenuous.  Accordingly, because Florida law will likely be applied to the plaintiff's claims, the Middle District of Florida is a more appropriate forum for the adjudication of plaintiff's claims.

In sum, this case has no substantive connection with the District of Columbia.  Instead, the plaintiff's allegations involve a Florida contract, with a Florida company, construed under Florida law, and involving witnesses and documents located in Florida. Based on these facts, the convenience of the witnesses, the

convenience of the parties, access to witnesses and sources of proof, and the interests of justice favor transfer. Thus, this Court should exercise its discretion and transfer this action to the Middle District of Florida, Jacksonville Division.

**CONCLUSION**

For the foregoing reasons, this Court should dismiss the Complaint for lack of personal jurisdiction and/or transfer the action to the U.S. District Court for the Middle District of Florida, Jacksonville Division.

KIRKLAND & ELLIS LLP

By    /s/ Thomas A. Clare
      Thomas A. Clare
      DC Bar No. 461964
      655 Fifteenth Street, NW
      12th Floor
      Washington D.C. 20005
      Telephone: (202) 879-5000
      Facsimile: (202) 879-5200
      Email: tclare@kirkland.com

            - and -

      BEDELL, DITTMAR, DEVAULT,
         PILLANS & COXE, P.A.
      Patrick P. Coll
      Florida Bar No. 0084670
      Kevin B. Cook
      Florida Bar No. 507474
      The Bedell Building
      101 East Adams Street
      Jacksonville, Florida 32202
      Telephone: (904) 353-0211
      Facsimile: (904) 353-9307
      E-Mail: pcoll@bedellfirm.com
      E-Mail: kcook@bedellfirm.com
      (motion for admission
       *pro hac vice* pending)

Attorneys for Zassi Medical Evolutions, Inc.

DEFENDANT'S MOTION TO DISMISS THE
COMPLAINT AND/OR TRANSFER THE ACTION


EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FOCUS ENTERPRISES, INC.,                    )
                                            )
                Plaintiff,                  )
                                            )
v.                                          )Civil Action No: 06-2068(GK)
                                            )
                                            )
ZASSI MEDICAL EVOLUTIONS, INC.,)
                                            )
                Defendant.                  )
                                            )
_____)

**AFFIDAVIT OF JOSEPH R. WALKER**

STATE OF FLORIDA      )
                      ):ss
COUNTY OF NASSAU      )

Before me, the undersigned authority, this day personally appeared Joseph R. Walker who, after being first duly sworn, deposes and says as follows:

1.    I, Joseph R. Walker, am over the age of eighteen and am qualified to give this affidavit.

2.    The information contained herein is based on my personal knowledge.

3.    I am the Chief Operating Officer of Zassi Medical
Evolutions, Inc. ("Zassi") and have held that position since
1999.

4.    This affidavit is in support of Zassi's Motion to
Dismiss the Complaint and/or Transfer the Action.

5.    I have been in the medical device industry since
1973.

6.    Prior to 1999, I worked for C. R. Bard, Johnson &
Johnson, Boston Scientific, and Bristol-Meyers Squibb Co.

7.    While at Bristol-Meyers Squibb Co., I was a senior
executive with profit and loss responsibility for ConvaTec
whose annual revenues were in excess of $100 million.

### Zassi's History

8.    Zassi was founded in 1997 by Peter von Dyck.

9.    Zassi is a closely held corporation organized under
the laws of the State of Florida with its principal place of
business in Fernandina Beach, Nassau County, Florida.

10.    Zassi is and has been engaged in the business of
designing, developing and manufacturing intellectual property

2

within the medical device industry.   For example, Zassi designs, develops, and manufactures state of the art gastrointestinal (GI) waste management systems.

11.   Zassi's first product to receive Food and Drug Administration clearance, the Bowel Management System (BMS), was commercialized in March 2003.

12.   The BMS device is a catheter system designed to safely and reliably divert, collect, and contain potentially harmful and contaminated GI waste from bedridden and immobilized patients.

13.   Another of Zassi's product under development is the Continent Ostomy Port (COP) which is the world's first, non-surgically placed port system intended to restore bowel and potentially urinary continence to millions of people who have been rendered incontinent and have an abdominal stoma as a result of ostomy surgery.

14.   Zassi has historically relied upon investment by third parties to fund the development and marketing of its products.

3

15.    Within the medical device industry, there are two primary methods for raising capital to fund product development, sale, and distribution:

(a)    through the sale of debt or equities to institutional or accredited private investors ("Investors"); and

(b)    by entering into strategic agreements for the sale or license of assets with other companies in the specific markets or which have the resources in place to quickly enter the specific market ("Strategics").

16.    Zassi has sought to raise capital through the sale of debt or equities approximately twelve (12) times.

17.    Since its founding in 1997, Zassi has directly maintained substantial and nearly continuous discussions with several prospective Strategics, including Hollister, Inc. ("Hollister") going back to 1998, when Zassi and Hollister entered into a confidentially/non-disclosure agreement

18.    In November 2005, Zassi and Hollister entered into another confidentiality/non-disclosure agreement.

4

**Focus Enterprises, Inc. and Its Two Agents:**
**William Inman and George Shea**

19.   In mid-2005, Mr. Inman advised me of his association with Plaintiff Focus Enterprises, Inc. ("Focus").   Prior to this, I had no knowledge of Focus.

20.   I have personally known William Inman since 2000.

21.   Mr. Inman informed me that he had become a partner in Focus, a nationwide organization that helped secure capital for small and mid-sized companies.

22.   During the time that I have known Mr. Inman, I understood that he maintained his residence in Duval County, Florida.   Prior to joining Focus, Mr. Inman operated his closely held corporation called "The Inman Company" in Jacksonville, Florida.

23.   In June 2000, Zassi and The Inman Company entered into a written Letter Agreement by which The Inman Company would use its efforts to identify Investors which may purchase equity in Zassi. See June 2, 2000 Letter Agreement, attached hereto as Exhibit A.   This Agreement provided that it would be governed by Florida law.

5

24.   No strategic authorization was ever made between Zassi and Mr. Inman or other Focus partner.

25.   In consideration for such services, The Inman Company received warrants which allowed it to acquire three percent (3%) of the issued and outstanding common stock of Zassi in the event of certain triggering events.   The Inman Company later exercised its warrants and is currently a shareholder of Zassi.

26.   On June 6, 2001, Zassi and The Inman Company entered into another agreement whereby the Inman Company attempted to raise capital for sixty (60) days.   See June 6, 2001 Letter Agreement, attached hereto as Exhibit B.   As with their prior agreement, Florida law governed.

27.   On February 5, 2007, I accessed Focus' website at http://www.focusenterprises.com/staff/Inman.asp which showed that Mr. Inman was a partner at Focus and listed his contact information as: 4720 Salisbury Road, Jacksonville, Florida 32256.   Office: (404) 963-8256; Cell: (904) 614-1438; Fax: (904) 493-6029.

28.   I have personally known George M. Shea since July 2005.

6

29. During the time that I have known Mr. Shea, I understood that he has maintained a residence in Nassau County, Florida.

30. On February 5, 2007, I accessed Focus' website at http://www.focusenterprises.com/staff/Shea.asp which showed that Mr. Shea was a managing partner at Focus and listed his contact information as: 4658-2 Carlton Dunes Drive #2 Amelia Island, Florida 32034. Office: (404) 963-8253; Cell: (904) 206-0219; Fax: (904) 491-5267.

31. The area code for telephone numbers in and around the greater Jacksonville, Florida metropolitan area is "904".

**Relationship Between Zassi and Focus**

32. In the Spring of 2005, Zassi determined that it would explore raising capital to fund the development and marketing of its products.

33. In or about July 2005, Mr. Inman approached Zassi in Florida about he and Mr. Shea, on behalf of Focus, providing services to locate Investors to raise capital through the sale of debt and/or equity.

7

34. Primarily based on Zassi's prior relationship with Mr. Inman, Zassi agreed to allow Mr. Inman, through his new firm, Focus, to attempt to raise capital on a non-exclusive basis through the sale of debt and/or equity to potential Investors Zassi had not already located and engage in negotiations with regarding the purchase of debt and/or equity. The entire agreement between Zassi and Focus was memorialized in a Written Agreement drafted by Focus and dated August 30, 2005 (the "Written Agreement"), a true and correct copy of which is attached as Exhibit C.

35. Peter von Dyck executed the Written Agreement in Florida on behalf of Zassi.

36. Mr. Inman executed the Written Agreement in Florida and transmitted the execution page by facsimile from his office in Jacksonville, Florida to Zassi's offices in Fernandina Beach, Florida.

37. The Written Agreement, like Zassi's two previous agreements with Mr. Inman's company, provided that it would be governed by Florida law.

38. Because Zassi insisted prior to the execution of the Written Agreement that Focus could solicit only Investors, not

8

Strategics, the Written Agreement did <u>not</u> provide for Focus to receive compensation if Zassi sold or licensed its assets to a Strategic.

39.  After executing the Written Agreement, Zassi sent confidential information about the company to Focus so that Focus could format a Confidential Information Memorandum ("CIM") that could be used by prospective Investors to evaluate whether to invest in Zassi.

40.  The original, previously-existing CIM was transmitted by hard copy from Florida to Mr. Inman in Florida in July 2005.

41.  After several meetings with Messrs. Inman and Shea in Florida, they instructed me to send the previously-existing CIM to a Focus research associate, Jeff Anderson.

42.  My recollection is that Mr. Anderson lived outside the District of Columbia and the contact information I have for him shows an Arlington, Virginia, telephone number: (703) 938-7418.

9

43. On at least one occasion, and possibly more, my contact with Mr. Anderson was when he was in Virginia, not within the District of Columbia.

44. I recently called Focus' office in the District of Columbia and first asked if Mr. Anderson was available. I was told by the person who answered the call that he was not in the office. I then asked whether he worked at that Focus office and was told, "not usually."

45. Between January 2006 and March 2006, Zassi personnel and Mr. Anderson communicated via e-mail and telephone about the contents of the CIM.

46. Mr. Anderson traveled to Florida to meet with Zassi employees for the kick off or orientation session for the CIM.

47. On or about February 7, 2006, Zassi held a shareholder meeting in Fernandina Beach, Nassau County, Florida.

48. Messrs. Inman and Shea were present at that meeting to explain the current equity market, and specifically, to explain that the equity market was improving in the medical device industry.

10

49.   There were seven (7) Zassi shareholders that attended that meeting.   Five (5) of those shareholders maintain residences in northeast Florida, a sixth works in Florida but lives in Georgia, and the seventh resides in Alabama.

50.   None of the shareholders at that meeting reside in the District of Columbia.   In fact, no Zassi shareholder resides in the District of Columbia.

### Zassi's Sale of Assets to Hollister

51.   Hollister is an independent, employee-owned Illinois corporation that manufactures and markets a variety of health care products, including ostomy care, continence care, wound care, mother-baby care, bladder control therapy, and patient identification.

52.   As part of its continence portfolio, Hollister marketed a drainable fecal pouch.   Similar to an ostomy pouch, this collection system is placed in the perianal anatomy in an effort to catch stool as it leaves the body.

11

53.   Zassi's BMS product line competed with Hollister's fecal pouch.   Hollister was, and still is, a competitor of Zassi.

54.   In addition to Zassi's early discussions with Hollister for several years prior to 2005, one of Zassi's vice presidents,  who formerly worked for Hollister, maintained that Hollister would be an ideal strategic partner for Zassi.

55.   In July or August 2005, the general manager of continence care for Hollister (Scott Holloway) contacted me to request a formal meeting to discuss the acquisition or license of the BMS.

56.   This was after Hollister's primary competitor, ConvaTec, a Bristol-Meyers Squibb Company and one of my former employers, had launched a product that was similar to and competed with Zassi's BMS.

57.   During late 2005 and through September 2006, Zassi negotiated directly with Hollister regarding the sale of Zassi's BMS product line to Hollister.

12

58.  Focus was never involved in any negotiations or discussions with Hollister or any other strategic in connection with the sale of the BMS product line.

59.  On or about July 14, 2006, Zassi and Hollister signed a Letter of Intent.  Zassi subsequently sold its BMS product line to Hollister.

60.  For the purpose of ensuring that Focus had relevant information so that it could continue its efforts to locate potential Investors pursuant to the Written Agreement, Zassi informed Focus (Messrs. Inman and Shea) on or about July 17, 2006, that Zassi had entered into the Letter of Intent and intended to sell its BMS product line to Hollister.

61.  By letter dated July 20, 2006 from Focus (a true and correct copy of which is attached as Exhibit D), Mr. Inman recommended that "The Focus engagement agreement should be amended to provide for a fixed fee at the closing of the [Hollister] transaction."

## Zassi Does Not Have Contacts With the District

62.  Zassi is not licensed or qualified to transact business in the District of Columbia and does not do so.

13

63.  Zassi is not authorized to do business within the District of Columbia.

64.  Zassi does not maintain an office or telephone listing within the District of Columbia.

65.  Zassi does not maintain a representative or agent for service of process in the District of Columbia.

66.  Zassi does not have a registered agent within the District of Columbia.

67.  Zassi was not served process within the District of Columbia.

68.  Zassi does not have an interest in, use, or possess any real property in the District of Columbia.  It has no bank account or telephone listing there, does not pay any taxes there, and has no office, place of business or mailing address there.

69.  Zassi does not contract to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed in the District of Columbia.

14

70.   Zassi's products were used within the District by various hospitals.   Zassi did not directly sell any of its products within the District.   The Zassi products that were used in the District were sold to third party distributors located in Maryland and represented less than two percent (2%) of Zassi's sales.

71.   Zassi does not have any sales representatives that call on or provide service within the District.

72.   No Zassi officer, director, or employee has ever traveled to the District relating to the Written Agreement, to work on the CIM, or for any other purpose relating to this matter, and the parties never contemplated resolving any dispute in the District.

73.   Pursuant to the Written Agreement (Section 2(a)), Zassi was required to pay Focus six (6) monthly payments of $5,000.00.

74.   Focus sent invoices for these payments to Zassi in Florida on which Focus requested Zassi to "Please remit to: FOCUS ENTERPRISES, INC. 1150 Connecticut Avenue, NW, Suite 515, Washington, DC 20036-4104."   A copy of the October 3, 2005 invoice from Focus is attached hereto as Exhibit E.

15

75. Zassi made these payments. In fact, Focus sent a seventh invoice which was inadvertently paid by Zassi. To date, Focus has not offered to refund this overpayment.

76. The vast majority of Zassi's current and former officers, directors, employees and shareholders reside in northeast Florida.

77. Zassi maintains its records and documents at its corporate offices in northeast Florida.

FURTHER AFFIANT SAYETH NOT.

_Joseph R. Walker_
Joseph R. Walker

Sworn to and subscribed before me this ___9th___ day of ___February___, 2007. The affiant is ( ) personally known to me or (√) produced a current ___Florida___ Driver's License as identification.

NOTARY PUBLIC, STATE OF FLORIDA

_Valerie Moeller_
Signature

VALERIE J MOELLER
Name (typed, printed or stamped)
Commission No. DD 575184
My Commission Expires: 9/20/2010



Notary Public State of Florida
Valerie J Moeller
My Commission DD575184
Expires 09/20/2010

16

Exhibit A
to
Affidavit of Joseph R. Walker

**PERSONAL & CONFIDENTIAL**

June 2, 2000

Peter M. von Dyck, President
Joseph Walker, Chief Operating Officer
Zassi Medical Evolutions, Inc.
1886 South 14th Street, Suite 6
Fernandina Beach, FL  32034

Dear Sirs:

This is to confirm the Agreement (the "Agreement") between The Inman Company
("Inman") and Zassi Medical Evolutions, Inc. (the "Company") under which Inman
will provide certain services as described below:

1)      For a period of one hundred eighty days from the date of this Agreement
        (the "Term"] the Company hereby engages Inman to act as its exclusive
        advisor for purposes of raising a minimum of $3 Million in new equity
        capital (the "Minimum Amount of Equity Capital"), on terms and
        conditions satisfactory to the Company in its sole discretion.

2)      Inman agrees to:
        (a)     Review the executive summary, including financial
                projections, to be used for presentations to prospective
                investors and make recommendations regarding same.
        (b)     Assist in identifying and pre-qualifying potential investors,
                each of which shall qualify as an "accredited investor" as that
                term is defined in Regulation D promulgated under the
                Securities Act of 1933, as amended (collectively, the "Inman
                Prospects"].   Notwithstanding the foregoing, the Company
                reserves the right to approve all prospects in advance.
        (c)     Assist in making presentations to prospective investors and
                conduct negotiations pursuant thereto.
        (d)     Supervise the preparation of all legal documentation related
                to the issuance of additional shares in the Company.

3)      The Company agrees to:
        (a)     Cooperate with Inman and provide relevant information as
                requested by Inman.  All such information shall be complete
                and accurate and not misleading, and the Company shall be
                obligated to disclose to Inman all material facts and events.
                Inman may rely upon the accuracy and completeness of all
                such information without independent verification.
        (b)     Furnish to Inman the name of all parties with whom the
                Company has conducted discussions relating to an
                investment in the Company (collectively, the "Excluded
                Prospects"].

Zassi Medical Evolutions, Inc.
June 2, 2000,
2

       (c)     Promptly notify Inman in the event that the Company receives an inquiry from a potential investor or acquirer.

4)    If the Company closes a transaction during the Term for the Minimum Amount of Equity Capital with one or more of the Inman Prospects [not including any capital raised by the Company from the Excluded Prospects), then the Company agrees that it will grant Inman a warrant to purchase up to 3% of the issued and outstanding common stock of the Company (the "Warrant"). The Warrant shall be exercisable for no additional consideration within the 30 day period immediately preceding the occurrence of any of the following events (each a "Liquidation Event"]:

       (a)     A sale of all or substantially all of the assets of the Company (but not including transfer by pledge or mortgage to a bona fide lender];

       (b)     A transfer of more than 50% of the outstanding equity of the Company (but not including a transfer by pledge or mortgage to a bona fide lender or a transfer for no consideration undertaken solely for estate planning purposes];

       (c)     A merger or consolidation of the Company into or with Another corporation in which the stockholders of the Company immediately preceding such merger or consolidation shall own less than 50% of the voting securities of the surviving corporation; or

       (d)     A liquidation of the Company.

The Company shall inform Inman of any potential Liquidation Event sufficiently in advance of its occurrence for the purpose of allowing Inman to exercise its Warrant.

5)    In the event that Zassi grants Inman the Warrant hereunder, and in further consideration thereof, Inman agrees that it will serve as Zassi's advisor (including performing all of the functions contemplated herein) with respect to assisting Zassi with raising an additional $2 million in equity capital (the "Optional Capital"]. The decision to engage Inman with respect to the Optional Capital shall be at Zassi's sole discretion and Zassi shall have the right to exercise such option at any time prior to the occurrence of a Liquidation Event. Notwithstanding anything herein to the contrary, Zassi shall have no obligation to engage Inman with respect to the Optional Capital and to the extent that Zassi elects to do so, Inman shall provide such advisory services to Zassi for no additional consideration. The provisions of this paragraph 5] shall survive the termination of this Agreement.

6)    The Company agrees to rely on its own counsel, accountants, and other advisors for legal, accounting, tax, regulatory and other similar expert advice.

Zassi Medical Evolutions, Inc.
June 2, 2000,
3

7) In rendering its service, Inman shall act in accordance with such lawful directions as may from time to time be given by the Company and shall have no authority to bind the Company in any way whatsoever. All information provided to Inman shall remain confidential at all times.

8) The Company agrees to indemnify Inman for any and all claims due to acts of its shareholders, management, or the Company.

9) The Company understands and agrees that Inman serves as advisors and shareholders to other companies and individuals. It is Inman's responsibility to disclose any situation that might be considered a conflict of interest. Should the Company deem a conflict sufficiently serious it will have the right to terminate this Agreement immediately without any obligation whatsoever.

10) The Company may terminate this Agreement at any time for any reason but if the Company closes a transaction for the sale of the Minimum Amount of Equity Capital with one or more of the Inman Prospects within 12 months of the termination of the Agreement, then the Company shall grant Inman the Warrant described in paragraph 4] above notwithstanding such termination.

11) This Agreement represents the entire understanding between the parties and, as such, supersedes all prior written or oral agreements or understandings. Time is of the essence in this Agreement and each and every provision hereof. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

If the foregoing correctly sets forth the understanding and agreement between Inman and the Company, please so indicate by signing in the space provided for that purposes.

The Inman Company:

By: _William O. Inman III_

Date: _June 2, 2000_

Agreed and Accepted:

Zassi Medical Evolutions, Inc.

By: _____

Date: __6-6-00_____

Zassi Medical Evolutions, Inc.
May 24, 2000 Page 4 of 4

## Excluded Prospects

The following parties are considered as Excluded Prospects. As such Inman will not be required to participate in capital formation initiatives with these parties. Furthermore, capital raised from these sources will have no effect on Inman's requirement to raise the    $3MM Equity Capital Target referenced in Paragraph one (1) or the Consideration thereof identified in Paragraph four (4).

It is anticipated that investors in the *Shareholder Group* and the *Board Member Group* may participate at the $100-200K range each.

*Shareholder Group*

Lee Hannah

Patrick McCann

Michael McCormick

Charles (Bucky) Clarkson

*Board Member Group*

Tae Wong

*Strategic Partner Group*

Bristol-Myers Squibb

# Exhibit B
## to
# Affidavit of Joseph R. Walker

**PERSONAL & CONFIDENTIAL**

June 6, 2001

Peter M. von Dyck, President
Joseph Walker, Chief Operating Officer
Zassi Medical Evolutions, Inc.
1886 South 14th Street, Suite 6
Fernandina Beach, FL  32034

Dear Sirs:

This is to confirm the Agreement (the "Agreement") between The Inman Company ("Inman") and Zassi Medical Evolutions, Inc. (the "Company") under which Inman will serve as advisor as described below:

1)      For a period of sixty days from the date of this agreement (the "Term") the Company hereby engages Inman to act as its exclusive advisor in connection with the sale of new debt or equity instruments on terms and conditions satisfactory to the Company in its sole discretion.

2)      Inman agrees to:

        (a)      Review and make recommendations regarding the Company's Business Plan, Executive Summary, Visual displays, etc, all of which are to be used by the Company in presentations to prospective investors.

        (b)      Visit the Company's offices for the purpose of gaining insight into the Company's operations, products, management, etc.

        (c)      Identify potential investors, each of which Inman shall reasonably believe to qualify as an "accredited investor" as that term is defined in Regulation D promulgated under the Securities Act of 1933, as amended. The Company reserves the right to approve all prospects.

        (d)      Facilitate and arrange for presentations by the Company to prospective investors.

Inman hereby represents and warrants to the Company that it will not engage in any activities pursuant to this Agreement that would require it to register as a broker or as a dealer under applicable federal or Florida securities law. In its capacity as advisor, Inman will not (i) obligate the Company in any way whatsoever, (ii) make any recommendations to potential investors concerning an investment in the Company, (iii) participate in any negotiation, advertisement, or general solicitation

Zassi Medical Evolutions, Inc.
June 6, 2001
Page 2

concerning any investment in the Company, (iv) perform any analysis of the investment transaction for any potential investor, (v) engage in any due diligence activities on behalf of investors, (vi) assist in or provide financing for any investment in the Company, (viii) provide to any potential investors any advice relating to the valuation of or the financial advisability of any investment in the Company, (ix) handle any funds or securities of the Company or (x) provide any other services to the Company concerning the terms or structure of the transaction.

3)   The Company agrees to:

    (a)   Prepare and be solely responsible for the accuracy and completeness of all disclosure materials furnished to potential investors.

    (b)   Cooperate with Inman and provide relevant information as requested by Inman. All such information shall be complete and accurate and not misleading, and the Company shall be obligated to disclose to Inman all material facts and events. Inman may rely upon the accuracy and completeness of all such information without independent verification.

    (c)   Rely on its own counsel, accountants, and other advisors for legal, accounting, tax, regulatory and other similar expert advice.

    (d)   Furnish to Inman the names of all parties with whom the Company has previously conducted discussions relating to an investment in the Company (including current shareholders) (collectively, the "Excluded Prospects").

    (e)   Promptly notify Inman in the event that the Company receives an inquiry from a potential investor.

4)   If the Company closes a transaction for the sale of debt or equity instruments during the Term or for a period of twelve months thereafter to a prospect that Inman introduces to the Company and registers with the Company as an "Inman prospect", then the Company agrees that it will pay Inman a "finders" fee of 7% of the amount raised from such prospects in excess of $2,000,000; provided, however, that Inman shall be entitled to no fee with respect to debt or equity capital raised by the Company from Excluded Prospects or investors who were not otherwise introduced to the Company by Inman.

5)   The Company agrees to indemnify Inman for any and all claims, liabilities, or expenses incurred as a result of any acts of its shareholders, management, or the Company. Inman agrees to indemnify the Company

Zassi Medical Evolutions, Inc.
June 6, 2001
Page 3

and its directors, officers and shareholders (collectively, the "Zassi Indemnified Parties") from and against any and all claims, liabilities or expenses incurred by any of the Zassi Indemnified Parties as a result of a breach of any representation, warranty or covenant of Inman set forth in this Agreement. Notwithstanding anything herein to the contrary, the aggregate indemnification obligations of a party hereunder shall in no event exceed 50% of the amount of capital raised in a transaction to which this Agreement is applicable. The indemnification obligations of the parties under this Agreement shall survive indefinitely the termination of this Agreement.

6)    The Company understands and agrees that Inman serves as advisor and shareholder to other companies and individuals. It is Inman's responsibility to disclose any situation that might be considered a conflict of interest. Should the Company deem a conflict sufficiently serious it will have the right to terminate this Agreement immediately without any obligation whatsoever.

7)    This Agreement represents the entire understanding between the parties and, as such, supersedes all prior written or oral agreements or understandings. Time is of the essence in this Agreement and each and every provision hereof. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

If the foregoing correctly sets forth the understanding and agreement between Inman and the Company, please so indicate by signing in the space provided for that purposes.

The Inman Company:

By: _William D. Inman III_

Date: _June 6, 2001_

Agreed and Accepted:

Zassi Medical Evolutions, Inc.

By: _____

Date: _6-6-01_

JAX1 #609019 v3

# Exhibit C
## to
# Affidavit of Joseph R. Walker

August 30, 2005

Mr. Peter M. von Dyck
President and CEO
Zassi Medical Evolutions, Inc.
1886 S. 14th Street, Suite 6
Fernandina Beach, FL 32034

Dear Peter:

This letter sets forth the terms and conditions of the engagement of FOCUS Enterprises, Inc. ("FOCUS") by Zassi Medical Evolutions, Inc. and affiliates,(the "Client") in connection with the following:

1. **Engagement.**

FOCUS shall in good faith use its best efforts to assist in raising Capital for investment in Client from an exclusive list of investor prospects, which shall be documented by FOCUS in Schedule A hereto as amended, on terms acceptable to the Client. In providing this assistance FOCUS will a) identify and locate prospective investor candidates, b) assist in pre-qualifying the investor candidate(s) to c) make introductions of the investor candidate(s) to the Client, and d) facilitate meetings between the Client and the investor candidates(s). The Client shall in good faith use its best efforts to cooperate with FOCUS in its efforts to complete the desired engagement by making available, without cost to FOCUS, all documentation reasonably necessary to satisfy the analysis of the Client on behalf of the investor candidate(s). The parties acknowledge that such documentation may be confidential or proprietary in nature and shall be subject to non-disclosure agreements.

FOCUS will not (i) obligate the Client in any way whatsoever, (ii) make any recommendations concerning an investment in the Client or in the investor candidate(s) (iii) participate in any negotiation, advertisement, or general solicitation concerning any investment in the Client or the merger candidate(s), (iv) perform any analysis of the transaction for the Client, or any potential investor, (v) assist in or provide financing for any investment in the Client, (vi) provide to any party any advice relating to the valuation of or the financial advisability of any investment in the Client or the investor candidate(s), (vii) handle any funds or securities of the Client or the investor candidate(s) (viii) provide any other services to the Client concerning the terms or structure of the transaction.

2. **Fees and Expenses.**

In consideration for services rendered by FOCUS, the Client shall remit the following:

Mr. Peter Von Dyck
8/30/2005
Page 2

a)  Client shall pay FOCUS a monthly fee of $5,000 for six months with the first payment due with the execution of this agreement.

b)  FOCUS shall be paid success fees on the locating of various financings or refinancings as they are accepted by Client and closed. Such fees are due and payable upon closing of any and/or all such financings developed and/or closed during the term of this agreement. In the event that the transaction is begun during the term of this agreement, any such fees described herein shall be due and payable upon closing of any described transaction, even though that closing may occur after termination of the agreement. Such fees will be as follows:

   i)  A cash fee equal to 5% of the total Transaction value of any and all common or preferred equity located on behalf of Client.

   ii)  FOCUS understands and acknowledges that Client has a formal agreement with Meadow Partners, LLC of Chicago, IL (Meadow), to assist Client in locating financing. Attached hereto is Schedule B that identifies the investors contacted by Meadow. With the exception of Polaris, Primus and River Cities, all of whom are investors with whom FOCUS has a relationship. Should Client close a transaction with investors on Schedule A within the time frames specified below, FOCUS fees shall be calculated as follows:

| | |
|---|---|
| Closing within 30 days of this agreement | FOCUS fee is 0% |
| Closing within 30-60 days of this agreement | FOCUS fee is 1% |
| Closing within 60-120 days of this agreement | FOCUS fee is 2% |
| Closing within 120-180 days of this agreement | FOCUS fee is 3% |
| Closing beyond 180 days of this agreement | FOCUS fee is 4% |

Additionally, Zassi Medical Evolutions is currently negotiating with a group of investors identified of Schedule C. In the event Client close a transaction with investors on Schedule B or C within the time frames specified above, FOCUS fees shall be calculated using the above formula.

Transaction value is defined as the total amount of value contributed to the Company by one or more investors in one or more transactions. In the event a portion of the Total Consideration takes the form of royalties, future considerations payable, licensing agreements, options, real estate leases, non-compete agreements, consulting agreements, marketing cooperation and similar arrangements, or any other allocation of Total

Mr. Peter Von Dyck
8/30/2005
Page 3

Consideration received or to be received, the value of these items will be included in the calculation of the fee payable to FOCUS.

c)  Client shall reimburse FOCUS for any out of pocket travel expenses incurred in connection with the performance of services pursuant to this agreement. Any expense in excess of $1,000 will be approved in advance. Expenses will be billed monthly and payment will be due upon receipt.

e)  The fees described in 2(b) and 2(c) above, shall be due and payable to FOCUS should the Client, any of its directors, officers, agents, employees and affiliates or each person, if any, controlling such affiliates enter into and close the Project or for any other project with any individuals or entities introduced, furnished or referred by FOCUS within twelve months after the termination of this Agreement. From time to time, as requested by the Client, FOCUS shall provide in writing listings of all individuals or entities contacted by FOCUS on the Client's behalf.

3.    **Indemnification.**

a)  The Client shall indemnify and hold harmless FOCUS and its affiliates, their respective directors, officers, agents, employees and each other person, if any, controlling FOCUS or its affiliates, to the full extent lawful, from and against any losses, claims, damages, expenses or liabilities (or actions, including shareholder actions, in respect thereof) related to or arising out of such engagement or FOCUS's role or services in connection herewith, and will reimburse FOCUS and any other party intended to be indemnified hereunder for all costs and expenses (including reasonable attorney's fees) as they are incurred by FOCUS or any such other indemnified party in connection with investigating, preparing for or defending any such action or claim in connection with pending or threatened litigation in which FOCUS or such other indemnified party is a party. The Client will not, however, be responsible for any claims, liabilities, losses, damages, costs or expenses which are determined to have resulted solely from FOCUS's bad faith or gross negligence. FOCUS shall not be liable for any errors, omissions or misrepresentations contained in any information furnished by the Client to FOCUS and in turn conveyed by FOCUS to a third party, including, without limitation, any financial information. The foregoing agreement shall be in addition to any rights that FOCUS or any indemnified party may have at common law or otherwise, including, but not limited to, any right to contribution.

Mr. Peter Von Dyck
8/30/2005
Page 4

    b)  It is understood that in connection with the indemnification described at Section 3.a, FOCUS may also be engaged to act for the Client or related parties in one or more additional capacities, and that the terms of this engagement or any such additional engagement may be embodied in one or more separate agreements. This indemnification shall apply to any such additional engagement and any modification of this engagement or such additional engagements, and shall remain in full force and effect following completion or termination of FOCUS engagement(s).

**4.**    **Termination.**

    The agreement may be terminated by either party upon 30 days written notice to the other. Notwithstanding the foregoing, however, Section 2.e, 3, 5, and 6 hereof shall survive the termination of this Agreement.

**5.**    **Confidentiality.**

    The parties acknowledge that information furnished to FOCUS by the Client may be confidential or proprietary in nature. Such information is for the sole purpose of evaluating the Project for development, joint venture or other merger consideration. Without written authorization from the Client, FOCUS shall not publish, disseminate or release the information to third parties except to those sources having the capability of completing the desired transaction. For purposes of this Agreement, "confidential information" shall mean private business and technical information which is of value to the Client by virtue of its not being generally known to or readily ascertainable by third parties who could obtain economic value from its disclosure or use.

**6.**    **Miscellaneous.**

    a)  This agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

    b)  If all or any portion of any of the provisions of this Agreement shall be declared invalid by laws applicable thereto, then the performance of said offending provision shall be excused by the parties hereto.

    c)  The titles or captions of the provisions of this Agreement are merely descriptive and are not representations of matters included or excluded from such provisions.

Mr. Peter Von Dyck
8/30/2005
Page 5

d) This Agreement supersedes all prior discussions and agreements among the parties with respect to the matters contained herein and constitute the sole and entire agreement among the parties hereto. No modification hereof shall be binding unless set forth in writing, signed by all parties hereto and attached hereto.

e) Time is of the essence in the performance of the obligations set forth in this Agreement.

f) This Agreement shall be governed and construed in accordance with the laws of the State of Florida.

If the foregoing accurately summarizes our understanding, we request that you sign below where indicated.

Very truly yours,

FOCUS Enterprises, Inc.

By _____

Accepted and Agreed this
30th Day of August, 2005
Zassi Medical Evolutions, Inc.

By _____

Peter M. von Dyck

President and CEO

Mr. Peter Von Dyck
8/30/2005
Page 5

    d)  This Agreement supersedes all prior discussions and agreements among the parties with respect to the matters contained herein and constitute the sole and entire agreement among the parties hereto.  No modification hereof shall be binding unless set forth in writing, signed by all parties hereto and attached hereto.

    e)  Time is of the essence in the performance of the obligations set forth in this Agreement.

    f)  This Agreement shall be governed and construed in accordance with the laws of the State of Florida.

If the foregoing accurately summarizes our understanding, we request that you sign below where indicated.

Very truly yours,

FOCUS Enterprises, Inc.

By_____

Accepted and Agreed this
30th Day of August, 2005
Zassi Medical Evolutions, Inc.

By_____
Peter M. von Dyck

President and CEO

Mr. Peter Von Dyck
8/30/2005
Page 6

Schedule A
FOCUS PROSPECTS

Mr. Peter Von Dyck
8/30/2005
Page 7

Schedule B
MEADOW PARTNER PROSPECTS

Targets Identified in July 27 e-mail less:

Polaris
Primus
River Cities

Mr. Peter Von Dyck
8/30/2005
Page 8

Schedule C
ZASSI PROSPECTS

All Zassi Shareholders excluding T. Wayne Davis and Boyd Pate
Leo Chang
Bill Rauwerdink
Gerhard Pavecic
Alex Hunt & Associates
Dan Murphy

Exhibit D
to
Affidavit of Joseph R. Walker



# FOCUS
### Enterprises, Inc.
**Investment Banking**

3353 Peachtree Rd NE
Suite 1160
Atlanta, GA 30326
www.focusenterprises.com

404-963-8256 direct
404-393-9942 fax
904-614-1438 cell

### VIA EMAIL

### Personal and Confidential

July 20, 2006

Mr. Peter M. von Dyck
Mr. Joe Walker
Zassi Medical Evolutions, Inc.
1886 S. 14th Street, Suite 6
Fernandina Beach, FL 32034

Gents:

Congratulations on your signed LOI with Hollister. It is great to see some market validation for all your work!

As your friends and advisors for the past year (in my case, for years), George and I feel compelled to share with you, on a <u>confidential basis</u>, our thoughts on recent events, questions you should anticipate, where we go from here and how to best complete a transaction as quickly as possible that maximizes value for your shareholders, management and employees.

Talking points:

1.    The arena you are about to enter is one in which Zassi's Board and Management have little experience. Selling a $50M medical device company is a once in a lifetime opportunity. Your credibility will be seriously compromised if a deal doesn't close.

2.    The Board and Management have a fiduciary responsibility to bring the "A" team to the negotiating table. This team must include competent and experienced M&A counsel, and experienced advisors with a track record for CLOSING deals!

As you know, several of your shareholders are friends and clients of FOCUS. Some have invested millions in your business. Zassi is not the last deal we want to do with them. They will ask questions of us, expect a complete and honest explanation of the negotiations to date, some details of the Hollister offer and events leading up to the execution of the LOI:

*1.    Are there other strategic buyers for Zassi and if so, how would they value the business? How many strategics have been contacted and how many have be researched as suitable buyers?*

FOCUS research staff developed a list of strategic buyers. Few have been contacted. FOCUS has not been asked to perform any analysis of offers or to participate in negotiations with strategic buyers.

2.  *At the shareholders meeting earlier this year, it was announced that FOCUS was being retained to explore ALL options! What has changed?*

    Management elected to handle initial negotiations with a small universe of strategics. FOCUS has concentrated on financial investors and has developed interest from serious players who are highly interested in making a $15-20MM investment; they have performed significant due diligence and should make a commitment next month.

3.  *Hollister is a $183M PRIVATE Company owned by its employees. This is a relatively small business in the MD industry. How does this impact the probability that they will close on Zassi?*

    Private companies often have difficulty closing transactions with other private companies. Most deals collapse under the weight of the due diligence, contract negotiations, asset valuation and financing.

    The most valuable asset in a medical device company is its intellectual property and the valuation of IP is difficult.

4.  *If the Company is owned by an ESOP it has an obligation to repurchase shares owned by employees at FMV. How does this impact the Company's cash flow and ability to raise new capital?*

    Most investors shy away from employee-owned businesses due to liability issues involving ownership by employees.

5.  *Hollister is a potential competitor with existing distribution. How should we proceed with due diligence? If Hollister does not close and develops their own BMS product, what is the impact to Zassi?*

    We've already seen our once great strategic partner (Convatec), attempt to steal our trade secrets. In the process they've built a $40 Million business in what should be OUR space!

    FOCUS has a great deal of knowledge and experience in the sale of companies with valuable IP.

6.  *What FINANCIAL due diligence have we performed on Hollister? Do they have the ability to close within 5 weeks? Have they shared their audited financials with us?*

    FOCUS has available proprietary, expensive research on private companies that will provide greater insight into the financial condition of Hollister, and allow us to handicap the likelihood they can close AND fulfill their future obligations.

    We also can provide detailed data on top management, including background checks.

7.  *Due to Hollister's close proximity to Channel Medical, how likely is it that they know each other and have or will discuss Zassi?*

The risks to us are high if they talk and believe they are the only two players for your business.

8. *What is the financial penalty to Hollister if they fail to close?*

In our opinion, and based simply upon the long term average of deals that close involving private companies, the odds are at least 50/50 that Hollister will not close. Break-up fees are normally a part of a deal, and we can and will negotiate a significant fee on your behalf.

9. *Is the acquisition being financed? If so, do they have a commitment from a lender?*

Our due diligence should include an immediate indication of financial strength from an <u>independent</u> third party.

10. *What are conditions precedent to closing?*

As experienced deal advisors, FOCUS knows the customary conditions precedent to a closing. There will be no surprises.

11. *Have they made other acquisitions? Any that failed to close? Have we talked with CEOs of the acquired companies or previous targets?*

If they have made no acquisitions, BIG PROBLEM! They will need lots of hand holding and assistance.

A major benefit to the FOCUS sale side process is the education, guidance and support we provide the inexperienced BUYER. We handle his lawyer, create a virtual due diligence room, and generally keep the process moving.

If the buyer's attorney is inexperienced in M&A or under-staffed, we will make a recommendation of new counsel.

12. *Is Hollister currently engaged in discussions for a sale of THEIR business? Will our agreement with Hollister and the corresponding consideration be impacted in any way by a subsequent sale of THEIR business?*

The MD business is consolidating quickly. Hollister is not likely to remain independent for very long.

13. *What additional compensation can Zassi's shareholders require if Hollister merges with a public company at a huge price?*

It is common for sellers of private companies in a rapidly consolidating industry to receive a portion of the selling price in "kickers" that are triggered when and if the acquirer becomes a target. FOCUS has extensive experience in these type agreements.

14.   *If a strategic is willing to offer up 17x revenues now, what would BMS be worth 3 years from now if Zassi had $10M in new capital? Would not new capital create greater value for the shareholders down the road vs a sale now?*

Management has been told by at least one PEG that the business should be worth $100 M in three years. FOCUS and management should prepare a financial model showing the various scenarios of a sale now for cash/earnout vs a recap and a sale for $100M in three years? FOCUS financial analysts do these studies routinely.

15.   *What are the representations and warranties required in a medical device transaction? Who makes those reps? Management or the shareholders? What is the amount of indemnification and the indemnification period? The amount of the holdback? What are reasonable break-up fees?*

As previously noted, FOCUS works closely with the largest law firms in America. These firms share with us industry-specific information on contract terms and conditions, including detailed data on holdbacks, escrows, baskets, and indemnity caps for deals of this size.

16.   *How is the earn out portion of the deal structured? Are the terms reasonable?*

Earn outs can be very messy and very seldom produce results consistent with projections.

17.   *What are to be the terms of management agreements and incentive plans for Zassi's management team? Are these reasonable and customary in today's environment?*

FOCUS is very experienced in negotiating these agreements in such a way as to protect management's relationship with the new owners.

18.   *When is the transaction likely to close?*

Before year end is a reasonable expectation.

19.   *What are the tax aspects of the transaction?*

Management does not provide shareholders with individual tax advice but FOCUS will prepare a schedule calculating the distributions to be made pursuant to a sale.

In addition to providing answers to these questions our recommendations include:

1.   There should be a special Board meeting ASAP to report on the status of all negotiations. At that time, FOCUS can present the list of prospects, confirm that it was management's choice to handle the strategics, and report on the responses.

It is important for the owners of Zassi to know how others perceive their business.

2.   With Board approval, FOCUS will work with management to create a competitive process for Channel and Hollister and perhaps others who may surface (In our opinion, the "no shop" language in the LOI does not prevent you from exploring a sale of <u>equity</u>).

It should be understood by all that there is no commitment to any transaction until approved by the Board and the execution of a formal purchase agreement.

3.  The FOCUS engagement agreement should be amended to provide for a fixed fee at the closing of a transaction (consistent with our previous discussions, we will consider a reduction in our fee in the event a transaction is consummated with a party introduced and negotiated by Meadow).

    This change aligns FOCUS' financial interests precisely with that of the shareholders, regardless of whether there is a sale, recap, merger, etc.

George and I feel strongly that FOCUS should lead the negotiating process going forward. Frankly, we are perplexed as to why you have chosen to exclude us in your discussions with strategics since we are compensated regardless and our role is the same as yours, to maximize value for your shareholders.

In virtually every FOCUS sale side engagement, part of our job is to handle ALL the negotiations. Over the past thirty years we have negotiated hundreds of transactions for a long list of satisfied clients. Our clients view us as trusted advisors and would never enter into any agreement without our participation.

For comparison purposes, no public Company would dare entering into an agreement without their banker's advice and counsel.

By handling the negotiations we take the heat off you, share the risk (or blame) of getting the deal closed and allow you to do what you do best....run your business.

Please call us when you are ready to discuss all this.

Sincerely,

William O. Inman, III

# Exhibit E
# to
# Affidavit of Joseph R. Walker



# FOCUS
## Enterprises, Inc.
**Investment Banking**

1150 Connecticut Avenue NW
Suite 515
Washington, DC 20036

202-785-9404
202-785-9413 fax
www.focusenterprises.com

Date _10/3/05_

Cod

CGLB 003          5000.00

October 3, 2005

Mr. Joe Walker
COO
Zassi Medical Evolutions, Inc.
1886 S. 14th Street, Suite 6
Fernandina Beach, FL  32034

Oct. 05
Returned

**Invoice**

Invoice No.:                    2005-221

Engagement:                Engagement of August 30, 2005

Retainer:                        $5,000.00

**TOTAL DUE**                **$5,000.00**

Please remit to:

                    FOCUS ENTERPRISES, INC.
                    1150 Connecticut Avenue, NW, Suite 515
                    Washington, DC  20036-4104

Sincerely,

William O. Inman III
Partner

Atlanta; San Francisco; Washington, DC

DEFENDANT'S MOTION TO DISMISS THE
COMPLAINT AND/OR TRANSFER THE ACTION

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

FOCUS ENTERPRISES, INC.          )
                                 )
                Plaintiff,       )
                                 )
vs.                              )     Civil Action No: 06-2068 (GK)
                                 )
ZASSI MEDICAL EVOLUTIONS, INC.)
                                 )
                Defendant.       )
                                 )
_____)

## AFFIDAVIT OF PETER VON DYCK

STATE OF FLORIDA    )
                    ):ss
COUNTY OF  Nassau   )

Before me, the undersigned authority, this day personally appeared Peter von Dyck who, after being first duly sworn, deposes and says as follows:

1.   I, Peter von Dyck, am over the age of eighteen and am qualified to give this affidavit.

2.   The information contained herein is based on my personal knowledge.

3.   I am the Chief Executive Officer of Zassi Medical Evolutions, Inc. ("Zassi").

4.   This affidavit is in support of Zassi's Motion to Dismiss the Complaint and/or Transfer the Action.

5.. While in Florida, I personally executed the letter agreement dated August 30, 2005 between Focus Enterprises, Inc. and Zassi (the "Written Agreement"), a true and correct copy of which is attached hereto as Exhibit "A".

6. On or about September 26, 2006, while I was traveling in Europe, I received a telephone voice mail message from Doug E. Rodgers, the CEO of Focus Enterprises, Inc. ("Focus").

7. In his voice mail message, Mr. Rodgers said that he understood that Focus and Zassi had entered into the Written Agreement and although it was "sloppy," he believed that Focus was due a commission on the sale of Zassi's asset to Hollister, Inc.

8. Mr. Rodgers also said that Focus would pursue all of its rights under the parties' agreement, including legal action against Zassi.

9. When I returned Mr. Rodgers' telephone call, I did not speak to him, but rather, received his voice mailbox.

10. I left a voice mail explaining that Zassi did not owe Focus any money under the Written Agreement and also explained that Focus had done an inadequate job in its performance under the Written Agreement, explaining that it had taken several months to get the Confidential Information Memorandum ("CIM") finalized, that no deals were presented by Focus to Zassi, and that no term sheets

2

were presented by Focus to Zassi.

11.   Aside from the exchange of voice mails referenced above and communication with Jeff Anderson regarding the CIM, I have had no contact with Focus within the District of Columbia.  I have been advised that Mr. Anderson does not usually work out of Focus' office within the District of Columbia.

12.   For several years, I have known and had business dealings with William Inman and have known George Shea for several years. The overwhelming majority of my contacts and interactions with Messrs. Inman and Shea occurred in Florida, a very few were in Georgia, and none were in the District of Columbia.

FURTHER AFFIANT SAYETH NOT.

_____
Peter von Dyck

Sworn to and subscribed before me this ___8___ day of _February_, 2007.  The affiant is ( ) personally known to me or ( ✓ ) produced a current _Florida___ Driver's License as identification.

NOTARY PUBLIC, STATE OF FLORIDA

_____
Signature

_____
Name (typed, printed or stamped)
Commission No._____
My Commission Expires: ___2 16 10___

# Exhibit A
## to
## Affidavit of Peter von Dyck

August 30, 2005

Mr. Peter M. von Dyck
President and CEO
Zassi Medical Evolutions, Inc.
1886 S. 14th Street, Suite 6
Fernandina Beach, FL 32034

Dear Peter:

This letter sets forth the terms and conditions of the engagement of FOCUS Enterprises, Inc. ("FOCUS") by Zassi Medical Evolutions, Inc. and affiliates,(the "Client") in connection with the following:

    1.  **Engagement.**

FOCUS shall in good faith use its best efforts to assist in raising Capital for investment in Client from an exclusive list of investor prospects, which shall be documented by FOCUS in Schedule A hereto as amended, on terms acceptable to the Client. In providing this assistance FOCUS will a) identify and locate prospective investor candidates, b) assist in pre-qualifying the investor candidate(s) to c) make introductions of the investor candidate(s) to the Client, and d) facilitate meetings between the Client and the investor candidates(s). The Client shall in good faith use its best efforts to cooperate with FOCUS in its efforts to complete the desired engagement by making available, without cost to FOCUS, all documentation reasonably necessary to satisfy the analysis of the Client on behalf of the investor candidate(s). The parties acknowledge that such documentation may be confidential or proprietary in nature and shall be subject to non-disclosure agreements.

FOCUS will not (i) obligate the Client in any way whatsoever, (ii) make any recommendations concerning an investment in the Client or in the investor candidate(s) (iii) participate in any negotiation, advertisement, or general solicitation concerning any investment in the Client or the merger candidate(s), (iv) perform any analysis of the transaction for the Client, or any potential investor, (v) assist in or provide financing for any investment in the Client, (vi) provide to any party any advice relating to the valuation of or the financial advisability of any investment in the Client or the investor candidate(s), (vii) handle any funds or securities of the Client or the investor candidate(s) (viii) provide any other services to the Client concerning the terms or structure of the transaction.

    2.    **Fees and Expenses.**

In consideration for services rendered by FOCUS, the Client shall remit the following:

Mr. Peter Von Dyck
8/30/2005
Page 2

a) Client shall pay FOCUS a monthly fee of $5,000 for six months with the first payment due with the execution of this agreement.

b) FOCUS shall be paid success fees on the locating of various financings or refinancings as they are accepted by Client and closed. Such fees are due and payable upon closing of any and/or all such financings developed and/or closed during the term of this agreement. In the event that the transaction is begun during the term of this agreement, any such fees described herein shall be due and payable upon closing of any described transaction, even though that closing may occur after termination of the agreement. Such fees will be as follows:

    i) A cash fee equal to 5% of the total Transaction value of any and all common or preferred equity located on behalf of Client.

    ii) FOCUS understands and acknowledges that Client has a formal agreement with Meadow Partners, LLC of Chicago, IL (Meadow), to assist Client in locating financing. Attached hereto is Schedule B that identifies the investors contacted by Meadow. With the exception of Polaris, Primus and River Cities, all of whom are investors with whom FOCUS has a relationship. Should Client close a transaction with investors on Schedule A within the time frames specified below, FOCUS fees shall be calculated as follows:

| | |
|---|---|
| Closing within 30 days of this agreement | FOCUS fee is 0% |
| Closing within 30-60 days of this agreement | FOCUS fee is 1% |
| Closing within 60-120 days of this agreement | FOCUS fee is 2% |
| Closing within 120-180 days of this agreement | FOCUS fee is 3% |
| Closing beyond 180 days of this agreement | FOCUS fee is 4% |

Additionally, Zassi Medical Evolutions is currently negotiating with a group of investors identified of Schedule C. In the event Client close a transaction with investors on Schedule B or C within the time frames specified above, FOCUS fees shall be calculated using the above formula.

Transaction value is defined as the total amount of value contributed to the Company by one or more investors in one or more transactions. In the event a portion of the Total Consideration takes the form of royalties, future considerations payable, licensing agreements, options, real estate leases, non-compete agreements, consulting agreements, marketing cooperation and similar arrangements, or any other allocation of Total

Mr. Peter Von Dyck
8/30/2005
Page 3

Consideration received or to be received, the value of these items will be included in the calculation of the fee payable to FOCUS.

c) Client shall reimburse FOCUS for any out of pocket travel expenses incurred in connection with the performance of services pursuant to this agreement. Any expense in excess of $1,000 will be approved in advance. Expenses will be billed monthly and payment will be due upon receipt.

e) The fees described in 2(b) and 2(c) above, shall be due and payable to FOCUS should the Client, any of its directors, officers, agents, employees and affiliates or each person, if any, controlling such affiliates enter into and close the Project or for any other project with any individuals or entities introduced, furnished or referred by FOCUS within twelve months after the termination of this Agreement. From time to time, as requested by the Client, FOCUS shall provide in writing listings of all individuals or entities contacted by FOCUS on the Client's behalf.

3.    **Indemnification.**

a) The Client shall indemnify and hold harmless FOCUS and its affiliates, their respective directors, officers, agents, employees and each other person, if any, controlling FOCUS or its affiliates, to the full extent lawful, from and against any losses, claims, damages, expenses or liabilities (or actions, including shareholder actions, in respect thereof) related to or arising out of such engagement or FOCUS's role or services in connection herewith, and will reimburse FOCUS and any other party intended to be indemnified hereunder for all costs and expenses (including reasonable attorney's fees) as they are incurred by FOCUS or any such other indemnified party in connection with investigating, preparing for or defending any such action or claim in connection with pending or threatened litigation in which FOCUS or such other indemnified party is a party. The Client will not, however, be responsible for any claims, liabilities, losses, damages, costs or expenses which are determined to have resulted solely from FOCUS's bad faith or gross negligence. FOCUS shall not be liable for any errors, omissions or misrepresentations contained in any information furnished by the Client to FOCUS and in turn conveyed by FOCUS to a third party, including, without limitation, any financial information. The foregoing agreement shall be in addition to any rights that FOCUS or any indemnified party may have at common law or otherwise, including, but not limited to, any right to contribution.

Mr. Peter Von Dyck
8/30/2005
Page 4

b) It is understood that in connection with the indemnification described at Section 3.a, FOCUS may also be engaged to act for the Client or related parties in one or more additional capacities, and that the terms of this engagement or any such additional engagement may be embodied in one or more separate agreements. This indemnification shall apply to any such additional engagement and any modification of this engagement or such additional engagements, and shall remain in full force and effect following completion or termination of FOCUS engagement(s).

### 4.    Termination.

The agreement may be terminated by either party upon 30 days written notice to the other. Notwithstanding the foregoing, however, Section 2.e, 3, 5, and 6 hereof shall survive the termination of this Agreement.

### 5.    Confidentiality.

The parties acknowledge that information furnished to FOCUS by the Client may be confidential or proprietary in nature. Such information is for the sole purpose of evaluating the Project for development, joint venture or other merger consideration. Without written authorization from the Client, FOCUS shall not publish, disseminate or release the information to third parties except to those sources having the capability of completing the desired transaction. For purposes of this Agreement, "confidential information" shall mean private business and technical information which is of value to the Client by virtue of its not being generally known to or readily ascertainable by third parties who could obtain economic value from its disclosure or use.

### 6.    Miscellaneous.

a) This agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

b) If all or any portion of any of the provisions of this Agreement shall be declared invalid by laws applicable thereto, then the performance of said offending provision shall be excused by the parties hereto.

c) The titles or captions of the provisions of this Agreement are merely descriptive and are not representations of matters included or excluded from such provisions.

Mr. Peter Von Dyck
8/30/2005
Page 5

    d) This Agreement supersedes all prior discussions and agreements among the
parties with respect to the matters contained herein and constitute the sole
and entire agreement among the parties hereto.  No modification hereof
shall be binding unless set forth in writing, signed by all parties hereto and
attached hereto.

    e) Time is of the essence in the performance of the obligations set forth in
this Agreement.

    f) This Agreement shall be governed and construed in accordance with the
laws of the State of Florida.

If the foregoing accurately summarizes our understanding, we request that you sign below where
indicated.

Very truly yours,

FOCUS Enterprises, Inc.

By _____

Accepted and Agreed this
30th Day of August, 2005
Zassi Medical Evolutions, Inc.

By _____

Peter M. von Dyck

President and CEO

Mr. Peter Von Dyck
8/30/2005
Page 5

    d)  This Agreement supersedes all prior discussions and agreements among the parties with respect to the matters contained herein and constitute the sole and entire agreement among the parties hereto.  No modification hereof shall be binding unless set forth in writing, signed by all parties hereto and attached hereto.

    e)  Time is of the essence in the performance of the obligations set forth in this Agreement.

    f)  This Agreement shall be governed and construed in accordance with the laws of the State of Florida.

If the foregoing accurately summarizes our understanding, we request that you sign below where indicated.

Very truly yours,

FOCUS Enterprises, Inc.

By_____

Accepted and Agreed this
30th Day of August, 2005
Zassi Medical Evolutions, Inc.

By_____

Peter M. von Dyck

President and CEO

Mr. Peter Von Dyck
8/30/2005
Page 6

Schedule A
FOCUS PROSPECTS

Mr. Peter Von Dyck
8/30/2005
Page 7


## Schedule B
## MEADOW PARTNER PROSPECTS


Targets Identified in July 27 e-mail less:

Polaris
Primus
River Cities

Mr. Peter Von Dyck
8/30/2005
Page 8

Schedule C
ZASSI PROSPECTS

All Zassi Shareholders excluding T. Wayne Davis and Boyd Pate
Leo Chang
Bill Rauwerdink
Gerhard Pavecic
Alex Hunt & Associates
Dan Murphy

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
FOCUS ENTERPRISES, INC.,           )
                                   )
       Plaintiff,                  )
                                   )
v.                                 )Civil Action No. 06-2068(GK)
                                   )
                                   )
ZASSI MEDICAL EVOLUTIONS, INC.,)
                                   )
       Defendant.                  )
                                   )
_____)
```

**ORDER**

Upon consideration of Defendant Zassi Medical Evolutions, Inc.'s Motion to Dismiss the Complaint and/or Transfer the Action and Memorandum of Points and Authorities in Support, and Request for Oral Argument, and any opposition thereto, for the reasons stated in Defendant's motion, the Court this _____ day of _____, 2007, CONCLUDES that this Court lacks personal jurisdiction over Defendant and ORDERS that this action is hereby transferred to the U.S. District Court for the Middle District of Florida, Jacksonville Division.

_____
United States District Judge

Copies to:

Thomas A. Clare, Esquire
Kirkland & Ellis LLP
655 Fifteenth Street, NW, 12th Floor
Washington D.C. 20005

Patrick P. Coll, Esquire
Kevin Cook, Esquire
Bedell, Dittmar, DeVault, et al.
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202

Gordon Locke, Esquire
74 Sheldrake Place
New Rochelle, NY 10804